IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

CHARLES FREDERICK WARNER,       )
                                )
            Petitioner,         )
                                )
vs.                             )       Case No. CIV-07-807-C
                                )
RANDALL G. WORKMAN, Warden,     )
      Oklahoma State Penitentiary, )
                                )
            Respondent.[1]      )


**MEMORANDUM OPINION**

Petitioner, a state court prisoner currently incarcerated pending the execution of a

judgment and sentence of death, has filed a *Petition for a Writ of Habeas Corpus* (hereinafter

"Petition"). (Dkt. No. 24.) Petitioner, appearing with counsel, challenges the judgment and

sentence entered against him in Oklahoma County District Court Case No. CF-97-5249.

Respondent has responded to the Petition and Petitioner has replied to this response. (Dkt.

Nos. 43, 49.) The state court record has been supplied.[2]

---

[1] When this action was commenced, Marty Sirmons was the warden of the Oklahoma State
Penitentiary and the properly named Respondent. Randall G. Workman is the current warden of the
Oklahoma State Penitentiary and the state officer having present custody of Petitioner. Pursuant to
Rule 25(d) of the Federal Rules of Civil Procedure, Mr. Workman should be substituted for Mr.
Sirmons as the proper party Respondent. See also Rule 2(a) of the Rules Governing Section 2254
Cases in the United States District Courts ("If the petitioner is currently in custody under a state-
court judgment, the petition must name as respondent the state officer who has custody.").

[2] References to the parties' pleadings shall be as follows: Petitioner's Petition shall be cited
as (Pet. at __); Petitioner's Attachments to his Petition as contained in his Appendix shall be cited
as (Appendix to Petition, Attachment __, p. __); Respondent's *Response to Petition for Writ of
Habeas Corpus* shall be cited as (Resp. at __); and Petitioner's *Reply to Response to Petition for
Writ of Habeas Corpus* shall be cited as (Reply at __).

## I.        PROCEDURAL HISTORY

Petitioner's judgment and sentences are a result of his third trial for the rape and murder of Victim, an eleven-month-old female child.[3]  On appeal of Petitioner's first trial, the Oklahoma Court of Criminal Appeals ("OCCA") reversed his convictions and sentences and remanded for a new trial.  Warner v. State, 2001 OK CR 11, ¶ 18, 29 P.3d 569, at 575. The OCCA concluded that the trial court erroneously failed to remove jurors for cause and abused its discretion in refusing to grant a continuance to permit trial counsel an additional day to secure a second stage mitigation witness.  Id. ¶¶ 11, 16-17, 29 P.3d at 574-75. Petitioner's second trial in March of 2003 ended in a mistrial.  (Tr., March 2003 Trial, Vol. III, pp. 484-89.)  Petitioner was retried in Oklahoma County District Court from June 16 through 26, 2003.  The jury convicted Petitioner of first degree murder and first degree rape, and fixed his punishment at seventy-five years for the charge of rape.  (VI O.R. at 1120.) Subsequently, the jury found two aggravating circumstances beyond a reasonable doubt and fixed his punishment at death.  (Id. at 1121-22).  Petitioner appealed and the OCCA remanded to the district court for an evidentiary hearing.  Warner v. State, 2006 OK CR 40,

---

References to the record shall be as follows:  The trial court's original record shall be cited as (__ O.R. at __); the trial transcript shall be cited as (Tr., Vol. __, p. __); and the state court evidentiary hearing transcript shall be cited as (Tr., Evid. Hearing, –/–/–, Vol. __, p. __).  References to Petitioner's March 2003 trial shall be cited as (Tr., March 2003 Trial, Vol. __, p. __).

[3] The names of three minors in this case are redacted to comply with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913-15, and this Court's Amended General Order Regarding Electronic Filing Policies & Procedures Manual. GO-09-6 (September 15, 2005). The homicide victim will be referred to as "Victim."  Petitioner's children will be identified as follows:  his son, who was six years old at the time of the incident, as "CW"; his daughter, who was four years old, as "VW"; and his other daughter, who was two years old, as "DW."

¶ 92, 144 P.3d 838, 873.  In a published opinion, the OCCA denied relief, affirming

Petitioner's judgment and sentences.  Id. ¶ 225, 144 P.3d at 896.  The Supreme Court denied

certiorari on May 14, 2007.  Warner v. Oklahoma, 550 U.S. 942 (2007).  The OCCA denied

Petitioner's *Application for Post-Conviction Relief* in an unpublished order dated December

19, 2006.  Warner v. State, No. PCD-2003-897 (Okla. Crim. App. Dec. 19, 2006).

## II.    FACTUAL BACKGROUND

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), when

a federal district court addresses "an application for a writ of habeas corpus by a person in

custody pursuant to the judgment of a State court, a determination of a factual issue made by

a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  For the purposes of

consideration of the present Petition, the Court provides and relies upon the following

synopsis from the OCCA's opinion summarizing the evidence presented at Petitioner's trial.

Following a review of the record, trial transcripts, and the admitted exhibits, the Court finds

the OCCA's summary adequate and accurate.  The Court therefore adopts the following

summary as its own:

> [Petitioner] was charged and convicted of the first degree rape and
> murder of 11 month old [Victim].  The victim and her mother, Shonda Waller,
> lived with [Petitioner] and his two children, six year old [CW] and five year
> old [VW].   Two year old [DW], [Petitioner's] daughter from another
> relationship, stayed with them on occasion.  On August 22, 1997, [Petitioner]
> left early that morning to pay a traffic fine at city court.  He returned home at
> approximately 10:00 to 10:30 a.m.  Ms. Waller prepared lunch for [Petitioner]
> and the older children and fed the victim baby food.  At approximately noon,
> Ms. Waller left for the grocery store.  All four children remained at home with
> [Petitioner].  At the time Ms. Waller left, the victim was dressed in a jumpsuit.
> Ms. Waller returned home at approximately 2:00 to 2:30 p.m.  She glanced in

the master bedroom and saw the victim lying on the bed. The victim appeared to be sleeping. Ms. Waller noticed the victim was dressed only in her diaper. Later that afternoon, [Petitioner] and Ms. Waller decided to take all the children with them to run errands. Ms. Waller intended to get the victim ready but [Petitioner] stopped her and volunteered to retrieve the victim from the bedroom. [Petitioner] returned to the living room holding the victim and saying that she was not breathing. When [Petitioner] handed the victim to Ms. Waller, the victim was limp. Ms. Waller began screaming and told [Petitioner] to take them to the emergency room. [Petitioner] drove Ms. Waller and all the children to the emergency room. On the way, Ms. Waller gave the victim CPR.

They arrived at the hospital at approximately 3:40 p.m. Emergency personnel took the victim and continued resuscitation efforts. All efforts failed and the victim was pronounced dead at 4:07 p.m. Emergency charge nurse Robin Justice was cleaning the victim before Ms. Waller saw her when she noticed bright red blood around the victim's rectum and tears to the rectum. Ms. Justice testified at trial that the injuries appeared to be fresh and recent. She called police and notified the attending physicians Drs. McCreight and Hill.

Dr. McCreight observed bright red blood staining the skin around the victim's rectum and tears around the rectum. X-rays indicated two skull fractures, one of which was depressed, and two fractures to the left jaw. Dr. McCreight testified that the injuries were recent, consistent with a violent shaking and inconsistent with a fall from a bed to a carpeted floor. He also testified that upon sustaining such injuries, the victim would not be able to eat, drink or play. His diagnosis was sexual and physical abuse.

In conducting the subsequent autopsy, the medical examiner Dr. Choi, determined the cause of death to be multiple injuries to the victim's head, chest, and abdomen. She determined the manner of death to be a homicide. Dr. Choi testified the victim suffered a crushing type injury to her head and internal injuries to her brain. The victim's jaw and three ribs were fractured, her liver was lacerated, and her spleen and lungs were bruised. There were bruises on the victim's chest the size of adult fingertips. She also observed retinal hemorrhages in the victim's eyes, which she testified were consistent with the victim being violently shaken. Additionally, Dr. Choi observed six different tears around the victim's rectum, which she testified were consistent with blunt force penetration. Dr. Choi also testified that upon receiving her injuries, the victim would not have been able to eat, drink or play.

4

Interviewed first at the hospital, [Petitioner] told officers he brought the victim, her mother, and the children to the emergency room. He said he had been in the master bedroom with the victim and two year old [DW]. He said [DW] gave the victim something to drink. After a while he left the room. When he returned to the bedroom between approximately 2:00 and 3:00 p.m., the victim was lying on the floor crying. He picked her up and noticed she had hit her head. He said she seemed to be dazed. He tried to comfort her and laid her on the bed to sleep. When he returned to get her at approximately 3:30 p.m., she was not breathing. Later, when [Petitioner] was arrested, he complained to officers that the knuckles on his right hand were sore.

In a subsequent search of [Petitioner's] home, officers discovered a sexually explicit videotape in the VCR located in the master bedroom, and a jar of Vaseline and a bottle of aloe vera [gel] nearby.

At trial, [Petitioner's] son [CW] testified [Petitioner] was the only adult with the children when Ms. Waller went to the store. He said that on the day the victim died, he saw [Petitioner] in the master bedroom shaking her. He said [Petitioner] was often angry with the victim because of her crying and general noisiness. [CW] admitted that he had previously testified the victim died because she was "beat up".

In his defense, [Petitioner] presented eight witnesses. These included medical experts who testified that the victim would have immediately lost consciousness upon sustaining the head injury, her injuries were consistent with hitting her head on a wooden bed frame, and the injuries to her chest could have occurred during CPR. Defense witnesses also testified that [CW] had said he had lied when he said he saw [Petitioner] hit the victim, that Ms. Waller had originally said [Petitioner] drove her to the store and she waited for him to take her home, that [Petitioner] was left handed, and that he took good care of the victim.

During the second stage of trial, in addition to incorporating all evidence from the first stage, the State presented evidence showing that [Petitioner's] four year old daughter [VW] had been physically abused by [Petitioner], that [Petitioner] physically punished [CW] and [VW] by whipping them with a belt or electrical cord, and that [Petitioner] had physically abused his ex-wife Vonricca Warner. In mitigation, [Petitioner] presented thirteen witnesses. The jury found the existence of the two alleged aggravating circumstances, "continuing threat" and "especially heinous, atrocious or cruel" and recommended the death penalty. The trial court sentenced accordingly.

<u>Warner</u>, 2006 OK CR 40, ¶¶ 2-10, 144 P.3d at 856-57.  Additional relevant facts from the record are provided where necessary.

## III.    PETITIONER'S CLAIMS FOR RELIEF

### A.    GENERAL CONSIDERATIONS:  Exhaustion and Procedural Bar

Federal habeas corpus relief is unavailable to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition.  28 U.S.C. § 2254(b); <u>Harris v. Champion</u>, 15 F.3d 1538, 1554 (10th Cir. 1994).  In every habeas case, the Court must first consider exhaustion.  <u>Harris</u>, 15 F.3d at 1554.  "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."  <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991).  Generally, a habeas petition containing both exhausted and unexhausted claims is deemed a mixed petition requiring dismissal.  <u>Rose v. Lundy</u>, 455 U.S. 509, 519 (1982); <u>Fairchild v. Workman</u>, 579 F.3d 1134, 1156 (10th Cir. 2009).  Under the AEDPA, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2554(b)(2).

### B.    THE STANDARD OF REVIEW

Under the AEDPA, in order to obtain federal habeas relief once a state court has adjudicated a particular claim on the merits, Petitioner must demonstrate that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

"A state-court decision is contrary to clearly established federal law if: (a) the state court applies a rule that contradicts the governing law set forth in Supreme Court cases; or (b) the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from [that] precedent."

Fairchild, 579 F.3d at 1139 (internal quotation marks and citations omitted); see also Williams v. Taylor, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring and delivering the opinion of the Court). A state court decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407. Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id. at 412. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 786 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

## C.   GROUNDS FOR RELIEF

### 1.   Ground One:  Jury Sequestration

In his first claim for relief, Petitioner argues the trial court committed constitutional error when it permitted the jury to separate on different occasions throughout second stage deliberations.  (Pet. at 9-26.)  Petitioner raised this claim on direct appeal and the OCCA remanded to the district court to conduct an evidentiary hearing pursuant to Rules 3.11(A) and 3.12(E) of the Rules of the Oklahoma Court of Criminal Appeals to determine:

> 1) whether there was a break in second stage jury deliberations and the jury was allowed to separate; 2) whether jurors were allowed to commingle with non-jurors during any point in the deliberations, and whether they were exposed to any outside influences; 3) whether the bailiff informed the jury that if they did not reach a verdict that evening, the jury would have to accompany the foreperson to her doctor's appointment the next morning, and if such a statement was made whether the jury was coerced into reaching a verdict by the statement; 4) whether the defense had sufficiently raised the presumption of prejudice pursuant to 22 O.S.2001, § 857 and Mooney v. State, 1999 OK CR 34, ¶ 63, 990 P.2d 875, 892; and 5) whether defense counsel was aware of any break in the jury's deliberations and whether defense counsel had the opportunity to raise a timely objection on the record but failed to do so.

Warner, 2006 OK CR 40, ¶ 93, 144 P.3d at 873.

During Petitioner's trial, a member of the jury broke her foot and was unable to climb the stairs to the jury deliberation room.  (Tr., Vol. V, p. 951.)  Without objection, the trial judge converted the courtroom into a jury room suitable for deliberations.  (Tr., Vol. VI, pp. 1249-50.)  The jury began its second stage deliberations at 2:55 p.m. on June 25, 2003, and

returned its verdict at 11:15 p.m. that evening.[4]  (Tr., Vol. VIII, pp. 1549, 1551.)  Petitioner alleges that during this time period, the jury improperly separated for multiple bathroom and smoking breaks.  In his motion for a new trial before the district court, Petitioner attached affidavits from members of the defense team that described jurors smoking and commingling with court staff and a witness for the State, Detective Mullenix.  Jurors were also seen using telephones.  According to the affidavits, the trial judge or his bailiff told the injured juror that if the jury was still deliberating the following morning, the entire jury would have to accompany the juror to her scheduled doctor's appointment.  (VI O.R. at 1155-60, 1163-65.)  On direct appeal, the State filed a motion to supplement the record to which it attached affidavits from the prosecutor, the bailiff at trial, and multiple jurors.  The OCCA considered the record on direct appeal inadequate to review the alleged error and remanded the matter to the district court for an evidentiary hearing.

On January 17th and 19th of 2006, district court received testimony.[5]  The OCCA summarized the evidence:

_____

[4] The transcript reflects a jury verdict at 11:15 a.m. and the record shows the verdict was entered the next day.  (Tr., Vol. VIII, p. 1551; VII O.R. at 1321.)  However, testimony from the evidentiary hearing indicates the jury returned a verdict on the same day it began deliberations.  (Tr., Evid. Hearing, 1/17/06, Vol. I, pp. 57, 108, 210-11, 222.)  The parties do not dispute the verdict was returned that evening and the OCCA's opinion reflects the same.  Warner, 2006 OK CR 40, ¶ 99, 144 P.3d at 874 ("The testimony from the evidentiary hearing shows the jury began deliberations just before 3:00 p.m. and continued until it reached a unanimous verdict at 11:15 p.m.").

[5] Petitioner produced seven witnesses:  the trial judge, the bailiff at trial, both of Petitioner's trial counsel, an additional assistant public defender, and two support members of the defense team.  The State called fifteen witnesses:  Det. Mullenix, the court reporter, the assistant prosecutor, and the twelve jurors.  (Tr., Evid. Hearing, 1/17/2006, Vol. I, pp. 2-3; Tr., Evid. Hearing, 1/19/2006, Vol. II, pp. 258-59.)

During [second stage deliberations], the jury did not stop to eat and did not require an overnight stay in a hotel. Recesses in deliberations were taken for jurors to use the restroom or to smoke. These recesses were infrequent and short in duration. The bailiff admonished the jury to make each recess short and the bailiff was able to monitor the movements of any juror to and from the restroom or to and from the smoking area (the usual jury deliberation room).

Testimony concerning whether the jurors were allowed to commingle with non-jurors during recesses was conflicting. Members of the defense team testified that jurors were smoking in the judge's outer chambers while court staff, Detective Mullenix, and possibly others were present. However, each of the jurors testified their only contact was with court staff. Each juror also testified they did not have any communication or contact with Detective Mullenix. Testimony shows he either excused himself when jurors were about to enter a room he was in or he waited in the judge's private office.

A recess was also taken for the jurors to move their cars due to the closing of the parking garage for the day. Testimony showed the jury was accompanied by the bailiff and deputies when moving their cars. According to the testimony this was a common occurrence for juries in Oklahoma County that deliberated into the evening. The record reflects that either defense counsel was informed when this occurred and did not object, or if not specifically notified, were well aware of [the] situation as the closing time of the parking garage was common knowledge in the courthouse.

Requests for recess or snacks were made by the jury knocking on the door to alert the bailiff to the existence of a note pushed underneath the door. When the bailiff responded, communication was made at the doorway. Snacks were provided to the jury either by the bailiff handing them off to the jury at the doorway or by the bailiff taking them into the room during a recess in deliberations.

Testimony concerning the use of telephones by jurors was conflicting. Two members of the defense team and the court reporter testified to seeing jurors use telephones during deliberations. However, each juror testified their cell phones were confiscated prior to deliberations and denied using a phone during deliberations or seeing any other juror use a phone.

The record is void of any objections by defense counsel to perceived improprieties surrounding the jury's deliberation. It was not until after the verdict was received did defense counsel ask to make a record. At that time,

counsel was told by the trial judge that due to the late hour, objections should be raised at the motion for new trial.

> . . . .

> . . . Testimony at the evidentiary hearing shows the foreperson sought medical advice for her broken foot and had to reschedule a doctor's appointment on one occasion due to the length of the trial. She subsequently became concerned that deliberations might require rescheduling a second doctor's appointment and inquired of the bailiff what might be done about it. The bailiff responded that the foreperson should not worry about the appointment because if necessary all the jurors could go with her to the doctor's appointment. The comment was made by the bailiff in jest. She did not take any steps to arrange transportation of the entire jury panel to the doctor's appointment the next day. Further, not all of the jurors heard the comment. Of those who did hear it, they understood it was made in jest and laughed at it. Every juror familiar with the comment testified it did not affect their deliberations or verdict.

_Warner_, 2006 OK CR 40, ¶¶ 99-104, 106, 144 P.3d at 874-75. The OCCA's factual determination is afforded a presumption of correctness which Petitioner has failed to rebut. 28 U.S.C. § 2254(e)(1).

Neither Petitioner's brief nor the Court's research has located clearly established federal law that affords a defendant a right to jury sequestration under the Constitution. _See, e.g._, _Powell v. Spalding_, 679 F.2d 163, 166 n.3 (9th Cir. 1982) (noting there is no constitutional right to sequestration); _Young v. Alabama_, 443 F.2d 854, 856 (5th Cir. 1971) (same). Oklahoma law, 22 Okla. Stat. § 857, requires "that the jury not be allowed to 'separate' between hearing the charge and returning a verdict." _Warner_, 2006 OK CR 40 ¶ 98, 144 P.3d at 874 (quoting _Bayliss v. State_, 1990 OK CR 51, ¶ 4, 795 P.2d 1079, 1080). "If after deliberations have begun the jury is allowed to separate and commingle with people

outside the jury panel, prejudice to the defendant is presumed." Mooney v. State, 1999 OK CR 34, ¶ 63, 990 P.2d 875, 892. In Petitioner's case, the OCCA determined that the jury's breaks did not constitute "separation" under Oklahoma law because "the recesses were so infrequent and short in duration." Warner, 2006 OK CR 40, ¶ 105, 144 P.3d at 875. Given that there was conflicting evidence of jurors interacting with third parties, the OCCA concluded, "even assuming there was commingling with non-jurors, the State adequately rebutted any presumption of prejudice as the testimony showed the jury was not exposed to any outside or prejudicial influences during deliberations." Id. In addition, the bailiff's comment to the juror foreperson regarding her doctor's appointment was "'a quintessential "housekeeping" matter'" and did not "constitute prejudicial or unauthorized communications." Id. ¶ 108, 144 P.3d at 876. In sum, the OCCA found "no statutory or constitutional violations." Id. ¶ 109, 144 P.3d at 876.

To the extent Petitioner claims the OCCA incorrectly applied state law, the Court denies the claim because it is not cognizable on federal habeas review. Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law.") (internal quotation marks and citation omitted). Entitlement to habeas relief for errors of state law requires a petitioner to show that the violation of state law resulted in a deprivation of due process. "[T]he deprivation occasioned by the state's failure to follow its own law must be 'arbitrary in the constitutional sense'; that is, it must shock the judicial conscience." Aycox v. Lytle, 196 F.3d 1174, 1180 (10th Cir. 1999); see also Hicks v. Oklahoma, 447 U.S. 343, 346 (1980).

The Court concludes that the OCCA's determination is not arbitrary in the constitutional sense. The OCCA ordered an evidentiary hearing to further explore Petitioner's allegations that his statutory right to a sequestered jury was sufficiently honored. As a result of the hearing, the OCCA concluded any breaks in the deliberations did not constitute a violation of 22 Okla. Stat. § 857. Each juror testified that his or her verdict was not affected by the breaks, or the bailiff's comment about the doctor's appointment of the foreperson. The OCCA's determination is not an arbitrary deprivation of a liberty interest necessary for a due process violation under state law claims on habeas review.

Accordingly, Petitioner's first ground for relief is denied.

## 2.    Ground Two:  Life Without Parole Jury Instructions

In his second claim for relief, Petitioner argues that the failure to instruct the jury on the meaning of life without parole deprived him of his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments.  (Pet. at 26-29.)  The trial court denied Petitioner's pretrial motions to instruct the jury on the meaning of life without parole.  (Tr., Motions Hearing, 3/5/2003, pp. 4, 24.)[6]  During second stage deliberations, the jury submitted a written question which asked, "Is there <u>ANY</u> <u>WAY</u> <u>or</u> <u>chance</u> for Charles to get out of prison

---

[6] Petitioner proposed instructions which explained that:  (1) under Article 6, Section 10 of the Oklahoma Constitution, the Pardon and Parole Board has no authority to make parole recommendations for convicts sentenced to death or life without parole (I O.R. at 130-33); and (2) a sentence of life without parole meant that the defendant will spend the remainder of his natural life in prison, and that there is no provision in the law for such a person ever to be considered for parole (II O.R. at 229-33; 305; 318-19; VI O.R. at 1023).  Petitioner also sought permission to introduce evidence on the distinction between the sentences of life and life without parole and other evidence relevant to the jury's sentencing determination.  (II O.R. at 296-98.)

if he is sentenced to life <u>without</u> parole? EVER?" (Second Stage Question from the Jury no.

1). The trial judge denied Petitioner's request to instruct the jury that the sentences "mean

what they say" and responded to the question with, "You have all of the law and evidence

necessary to reach a verdict." (Tr., Vol. VIII, pp. 1549-51; Second Stage Question from the

Jury no. 1). On appeal, the OCCA found no error and denied relief. <u>Warner</u>, 2006 OK CR

40, ¶¶ 158-61, 144 P.3d at 885-86. Petitioner argues the OCCA's determination is contrary

to, or an unreasonable application of, clearly established law as determined by the Supreme

Court of the United States.

In <u>Simmons v. South Carolina</u>, 512 U.S. 154, 156 (1994), a plurality of the Court held

that if a "defendant's future dangerousness is at issue, and state law prohibits the defendant's

release on parole, due process requires that the sentencing jury be informed that the

defendant is parole ineligible." <u>See also</u> <u>Shafer v. South Carolina</u>, 532 U.S. 36, 51 (2001)

(holding <u>Simmons</u> applies to South Carolina's new capital sentencing scheme); <u>Kelly v.</u>

<u>South Carolina</u>, 534 U.S. 246, 248 (2002) (again applying <u>Simmons</u> to South Carolina's

sentencing scheme). In <u>Simmons</u>, the jury was faced with the sentencing decision between

life imprisonment or death, unaware that Simmons was legally ineligible for parole.

<u>Simmons</u>, 512 U.S. at 158-60. The prosecution argued Simmons was a future danger and

that such dangerousness should be considered in arriving at a sentencing decision. <u>Id.</u> at 157.

After an inquiry from the jury asking whether a sentence of life imprisonment includes the

possibility of parole, the trial judge instructed the jury not to consider parole or parole

eligibility in making its decision. <u>Id.</u> at 160. On writ of certiorari, the Court held that raising

the issue of a petitioner's future dangerousness without informing the jury of his parole ineligibility has "the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration" and amounts to a due process violation.  Id. at 161-62; see also Mayes v. Gibson, 210 F.3d 1284, 1294 (10th Cir. 2000). The Court noted, "We express no opinion on the question whether the result we reach today is also compelled by the Eighth Amendment."  Simmons, 512 U.S. at 162 n.4.

Oklahoma's sentencing scheme provides that a jury, after finding an aggravating factor beyond a reasonable doubt and upon consideration of mitigating evidence, must decide between the three sentencing options of life, life without parole, and death.  21 Okla. Stat. §§ 701.09, 701.10; Instruction No. 4-76, OUJI-CR (2d).  The Tenth Circuit has held that this scheme satisfies the "false choice" concern in Simmons.  See Mayes, 210 F.3d at 1294 ("We believe this three-way choice fulfills the Simmons requirement that a jury be notified if the defendant is parole ineligible."); see also Hamilton v. Mullin, 436 F.3d 1181, 1190-92 (10th Cir. 2006) (applying Simmons); Mollett v. Mullin, 348 F.3d 902, 909-23 (10th Cir. 2003) (applying Simmons to Oklahoma's sentencing scheme); Johnson v. Gibson, 254 F.3d 1155, 1165 (10th Cir. 2001) (holding Oklahoma's instructions on the three sentencing options satisfies Simmons).

To succeed in a due process claim under Simmons, a petitioner must establish four requirements:

> (1) the prosecution seeks the death penalty; (2) the prosecution places the defendant's "future dangerousness . . . at issue," (3) the jury asks for clarification of the meaning of "life imprisonment," or a synonymous statutory

term, and (4) the judge's response threatens to cause "a jury's misunderstanding so the jury will . . . perceive a 'false choice' of incarceration when future dangerousness is at issue."

Mollett, 348 F.3d at 914 (internal citations omitted).  See also Hamilton, 436 F.3d at 1191 (applying Mollett's four requirements).

In the present case, Petitioner meets the first three of the Simmons requirements.  The prosecution sought the continuing threat aggravating circumstance in Petitioner's capital trial and the jury asked for clarification on the meaning of life without parole.  Importantly, the trial judge's response referred the jury back to its instructions.  This response did not threaten to create a misunderstanding within the jury such that it would perceive a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration.  Welch v. Workman, 639 F.3d 980, 1005 (10th Cir. 2011) ("[I]f the trial court simply directs the jury to review the instructions again, the defendant's due process rights are not violated."), pet. for cert. filed, No. 11-5284 (July 11, 2011).  As a result, Petitioner's alleged due process violation fails.

Respondent argues Petitioner's claim as it relates to the Eighth Amendment was not properly presented to the state court and is therefore unexhausted.  (Resp. at 31-32.) According to Respondent, all of the cases cited by Petitioner in support of his claim addressed only whether the Due Process Clause was violated.  Petitioner argues he fairly presented his claim to the OCCA.  (Reply at 5-7.)  The Court need not determine whether Petitioner sufficiently raised his claim in state court because it is more easily denied on the merits.  28 U.S.C. § 2254(b)(2).  Petitioner fails to cite clearly established federal law that

supports an Eighth Amendment violation for a failure to instruct a jury on the meaning of life without parole. As noted above, the Court in <u>Simmons</u> expressly limited its holding as deriving from principles of due process. <u>Simmons</u>, 512 U.S. at 162 n.4. As a result, Petitioner's claim under the Eighth Amendment also fails. The Court denies Petitioner's second claim for relief.

### 3. Ground Three: Opinion Testimony

In his third claim for relief, Petitioner argues he was denied his constitutional right to due process when the trial court admitted certain opinion testimony. Specifically, Petitioner complains of: (1) emergency room physician Dr. William McCreight's opinion that Victim suffered physical and sexual abuse; (2) Kathleen Hatlelid, physician's assistant, regarding her opinion that VW was physically abused; and (3) child welfare worker Rebecca Price vouching and bolstering of CW and Detective Willy Edwards. (Pet. at 33.) Petitioner presented this claim on direct appeal and the OCCA denied relief. <u>Warner</u>, 2006 OK CR 40, ¶¶ 20-28, 144 P.3d at 859-61. Respondent argues the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law. (Resp. at 34-38.)

Acknowledging the limited scope of habeas review of state evidentiary decisions, Petitioner submits that the trial court's errors were "'so grossly prejudicial that [they] fatally infected the trial and denied the fundamental fairness that is the essence of due process.' <u>Fox v. Ward</u>, 200 F.3d 1286, 1296 (10th Cir. 2000), (quoting <u>Williamson v. Ward</u>, 110 F.3d 1508, 1522 (10th Cir. 1997))." (Pet. at 30.) <u>See also</u> <u>Hooker v. Mullin</u>, 293 F.3d 1232, 1238 (10th Cir. 2002). State evidentiary decisions do not rise to a due process violation unless

they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Montana v. Egelhoff, 518 U.S. 37, 43 (1996) (internal quotation marks and citation omitted); see also Revilla v. Gibson, 283 F.3d 1203, 1212 (10th Cir. 2002).

### a. Opinions of Dr. McCreight and Ms. Hatlelid

During the first stage of Petitioner's trial, the State called Dr. McCreight as a witness. Previously, the trial court overruled Petitioner's motion in limine to exclude Dr. McCreight's sexual abuse diagnosis and granted Petitioner a continuing objection. (III O.R. at 593; Tr. Vol. III, p. 538.) Dr. McCreight was an emergency room physician on August 22, 1997, and treated Victim upon arrival at Mercy Hospital. (Tr., Vol. III, pp. 596-97.) On direct examination, Dr. McCreight recounted the efforts of the hospital staff to treat Victim. Following Victim's death, Dr. McCreight observed blood and a tear to her rectum. (Id. at 610.) Additional examination revealed that Victim had suffered at least two skull fractures, a fracture of the left side of the mandible, and a rib fracture. (Id. at 615-16.) Dr. McCreight testified that his overall diagnosis for Victim was "physical and sexual abuse." (Id. at 618.) Further, according to Dr. McCreight, such injuries were inconsistent with Victim falling from a bed onto a padded and carpeted floor. The injuries described would have prevented Victim from drinking water or playing with another child. (Id. at 618-19.) These last two opinions conflicted with Petitioner's version of Victim's death.

At the second stage of Petitioner's trial, Kathleen Hatlelid testified about her observation of Petitioner's oldest daughter, VW. Based upon her experience and personal

observation of visible scars on VW's jaw, torso, thighs, and left arm, Ms. Hatlelid concluded "[t]hat this child was physically abused, probably on many different occasions." (Tr., Vol. VII, 1278-81.) The State solicited this evidence in support of the continuing threat aggravating circumstance.

The OCCA concluded that the testimony of Dr. McCreight and Ms. Hatlelid was properly admitted because it was based on the witnesses' experience and observations:

> Dr. McCreight's diagnosis that the victim had suffered physical and sexual abuse was based upon his experience as an emergency room physician for over ten years. His diagnosis was also based upon his observations of the victim's injuries. Kathleen Hatlelid's testimony was based upon her eleven years of experience as a physician's assistant specializing in the area of suspected child abuse. Her testimony was also based upon her observation and examination of [VW]. The opinion testimony of both of these medical experts assisted the jury in understanding the cause of the injuries found on both children. This Court has previously found such testimony properly admissible under § 2702. See Revilla v. State, 1994 OK CR 24, ¶ 20, 877 P.2d 1143, 1150; cert. denied, 513 U.S. 1096, 115 S.Ct. 764, 130 L.Ed.2d 661 (1995); Roubideaux v. State, 1985 OK CR 105, ¶ 23, 707 P.2d 35, 39. Further, the witnesses' opinions were not improper opinion testimony on an ultimate issue since the opinions did not tell the jury what result to reach. See Welch v. State, 2000 OK CR 8 ¶ 23, 2 P.3d 356, 369, cert. denied, 531 U.S. 1056, 121 S.Ct. 665, 148 L.Ed.2d 567 (2000).

Warner, 2006 OK CR 40, ¶ 23, 144 P.3d at 860. The Court determines that the testimony of Dr. McCreight and Ms. Hatlelid did not render Petitioner's trial fundamentally unfair such that he was deprived of his due process rights.

### b. Testimony of Ms. Price

Rebecca Price, a child welfare worker at the Department of Human Services, was the first individual to interview CW. (Tr., Vol. V, pp. 1094-95.) The interview took place the

day after Victim's death. Ms. Price testified that CW said he had never seen his dad hit or

hurt Victim, stating that he only yelled at her. (Id. at 1095.) At trial, CW testified earlier that

he saw his father shake Victim on the day of her death. (Tr., Vol. IV, p. 864.) Addressing

this discrepancy, Ms. Price stated on cross-examination by the State that it was "very

normal" for a child like CW to hesitate or refuse to give incriminating information about his

parents. (Id. at 1099-1100.) Ms. Price also testified that it is not uncommon for a child in

a suspected abuse case to "open up" to a police officer in the days after an incident. (Id. at

1102.) Further, Ms. Price was familiar with Det. Edwards' investigation techniques and

procedures he used to talk with kids about suspected child abuse and considered them

"proper." (Id. at 1105-7.) Petitioner argues Ms. Price's testimony improperly bolstered and

vouched for the credibility of CW and Det. Edwards' techniques for interviewing children.

Petitioner alleges this testimony rendered his trial fundamentally unfair and violated

his right to due process. On direct appeal, the OCCA denied relief, concluding as follows:

> Here, Price testified that when she interviewed [CW] he was six years
> old. She gave no opinion on the truthfulness of his statements. As for her
> testimony regarding Detective Edwards, she testified she had observed
> Detective Edwards and the way he interviewed suspected child abuse victims.
> She said she thought he used proper techniques in trying to get information
> from children. Ms. Price's testimony was not improper vouching for Detective
> Edwards as it addressed only the procedures he used, not the veracity or
> credibility of any responses he received in his interviews.

Warner, 2006 OK CR 40, ¶ 25, 144 P.3d at 861. Petitioner argues the OCCA's

determination is contrary to, or involved an unreasonable application of, clearly established

federal law. Further, pursuant to § 2254(d)(2), Petitioner submits that the OCCA's holding

that Ms. Price did not give an opinion on the truthfulness of CW's testimony and that her testimony did not improperly vouch for Det. Edwards is an unreasonable determination of the facts in light of the evidence presented at trial.

In support of his argument, Petitioner relies on Parker v. Scott, 394 F.3d 1302 (10th Cir. 2005), a habeas case in which the Tenth Circuit considered whether testimony from three of the State's witnesses impermissibly bolstered or "vouched" for the credibility of a child in a trial for sexual abuse. Parker was convicted of repeatedly sexually abusing a seven-year-old child. At trial, the child's testimony described some specifics of the abuse, but the testimony was less clear on other parts of the abuse. Id. at 1307. Parker strongly denied the allegations. Reviewing the state court's evidentiary rulings for fundamental fairness under due process principles, the Tenth Circuit concluded that, taking the witnesses' testimonies together, Parker's due process rights were not violated. Even though each witness's testimony indicated a belief that sexual abuse had occurred, the jury remained capable of determining the credibility of the child's testimony. Id. at 1314.

In Petitioner's case, the closest Ms. Price came to bolstering the credibility of CW was her testimony that, in her experience as a child welfare worker, it is common for children in abuse cases to refrain from incriminating their parents shortly after the alleged abuse and that such children may later feel comfortable disclosing additional facts. At no point did Ms. Price give her opinion that CW was being truthful. Similarly, her testimony concerning the investigation techniques of Det. Edwards did not improperly bolster his credibility. Ms. Price merely indicated Det. Edwards used proper interview techniques. The OCCA's factual

determination to the same is not an unreasonable determination in light of the evidence presented at trial.

Petitioner also claims error in the trial court's failure to hold a hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), to determine the admissibility of the expert testimony.  (Pet. at 40-41.)  However, Daubert is not a rule of constitutional law and does not provide a basis for habeas relief.  Wilson v. Sirmons, 536 F.3d 1064, 1101-02 (10th Cir. 2008) ("Daubert does not set any specific constitutional floor on the admissibility of scientific evidence.").  The appropriate inquiry for a federal habeas court is whether the admission of the challenged evidence violates Petitioner's due process rights.  Id. at 1102.  As discussed above, the Court concludes Petitioner's due process rights were not offended.

Based on the foregoing, the Court determines that the testimonies of Dr. McCreight, Ms. Hatlelid, and Ms. Price did not render Petitioner's trial fundamentally unfair in violation of his due process rights.  Accordingly, Petitioner's third claim for relief is denied.

### 4.    Ground Four:  Restrictions on Cross-Examination of Shonda Waller

Petitioner argues in his fourth claim for relief that he was denied his Sixth and Fourteenth Amendment rights to present a meaningful defense, due process, and confrontation when the trial court restricted his cross-examination of Shonda Waller.  (Pet. at 42-46.)  The trial court granted the State's motion in limine to prevent Petitioner from cross-examining Ms. Waller and presenting evidence of, among other things:  (1) Ms. Waller

considering whether to place Victim in adoption; (2) whether Victim was born as the result of a rape; (3) whether Ms. Waller went out drinking in the days before Victim's death, the day after, and the night of Victim's funeral; (4) whether Ms. Waller attempted to give Petitioner's property away after his arrest; (5) whether Ms. Waller provided a headstone for Victim; and (6) whether Ms. Waller provided adequate care for her baby. (III O.R. at 566-67; Tr., Vol. III, pp. 744-46; Tr., Vol. VI, p. 1141.) In addition, Petitioner claims the restrictions on his examination of Ms. Waller affected the jury's second stage verdict because the excluded evidence would have sharply contrasted with her emotional victim impact testimony. (Pet. at 45.) Petitioner presented his claim as it relates to the first stage of his trial to the OCCA on direct appeal. The OCCA denied relief. Warner, 2006 OK CR 40, ¶¶ 29-32, 144 P.3d at 861-62.

Respondent argues Petitioner's second stage claim is unexhausted. (Resp. at 39.) The Court agrees. In his Reply, Petitioner submits that he fairly presented his claim to the OCCA in his eighteenth proposition of error on direct appeal, which addressed cumulative error. (Reply at 20.) However, Petitioner did not argue that the subject matter of the restricted cross-examination influenced the jury's second stage verdict. Before this Court, Petitioner cites the following passage from his brief on direct appeal to support fair presentation of the issue in state court: "To determine whether a sentence is excessive, [the OCCA] considers the entire record, including improper matter received without objection, and where justice requires, the sentence will be modified. Owens v. State, 706 P.2d 912, 913 ([Okla. Crim. App.] 1985)." (Appellant's Brief, Case No. D-2003-829, pp. 99-100.) The quoted passage

falls far short of the "fair presentation" requirement. <u>Demarest v. Price</u>, 130 F.3d 922, 932 (10th Cir. 1997). Fair presentation "means that the substance of the claim must be raised [in state court]. The prisoner's allegations and supporting evidence must offer the state courts a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." <u>Id.</u> (internal quotations omitted). Were Petitioner's quoted passage sufficient to meet the fair presentation requirement, nearly any claim relating to Petitioner's sentence would be "exhausted" for purposes of habeas review. The Court therefore applies "anticipatory procedural bar" to Petitioner's claim as it relates to the second stage of his trial and denies relief. <u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007) ("'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it.") (internal quotation marks and citation omitted).

Turning to Petitioner's exhausted claim, Petitioner cites United States Supreme Court cases regarding the right to confrontation in support of his argument that the trial court violated his constitutional rights. <u>See</u> <u>Olden v. Kentucky</u>, 488 U.S. 227 (1988); <u>Delaware v. Van Arsdall</u>, 475 U.S. 673 (1986); <u>Davis v. Alaska</u>, 415 U.S. 308 (1974). The Confrontation Clause guarantees an accused the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." <u>Davis</u>, 415 U.S. at 315-16 (internal quotation marks and citation omitted). Cross-examination permits an accused the opportunity to test the believability of a witness as well as the truthfulness of that witness's

testimony. Id. at 316.  However, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam).  Importantly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  Van Arsdall, 475 U.S. at 679.  The denial of a defendant's right to confrontation is subject to harmless error review.  Id. at 684.

The OCCA concluded Petitioner failed to argue how the excluded evidence was relevant to Ms. Waller's bias, credibility, or motivation in testifying.  Warner, 2006 OK CR 40, ¶ 30, 144 P.3d at 862.  Before this Court, Petitioner also fails to proffer an explanation as to the relevance of the challenged evidence.  To be sure, the subjects of the evidence Petitioner sought to include are collateral to the issue of Ms. Waller's bias, motive, or credibility.  In addition, as described by the OCCA, Petitioner was able to cross-examine Ms. Waller:

> [T]he trial court did not prevent [Petitioner] from challenging Ms. Waller's credibility as a truthful witness and did not deny him the ability to put on a defense.  [Petitioner] thoroughly cross-examined Ms. Waller with prior inconsistent statements concerning the timetable of events the day of the murder.  Through this cross-examination, [Petitioner] set out his defense that the victim's injuries did not occur until Ms. Waller returned home from the grocery store.

Id. ¶ 31, 144 P.3d at 862.  A review of the record confirms the reasonableness of the OCCA's determination that the trial court did not deny Petitioner his constitutional rights by excluding the challenged evidence described.  Petitioner's fourth claim for relief is denied.

### 5. Ground Five: Sufficiency of the Evidence for Petitioner's Conviction of Rape in the First Degree

In his fifth claim for relief, Petitioner argues there was insufficient evidence to support his conviction of rape in the first degree.  (Pet. at 46-55.)  Petitioner presented this claim on direct appeal and the OCCA denied the claim on the merits.  Warner, 2006 OK CR 40, ¶¶ 33-40, 144 P.3d at 862-63.  Respondent argues the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.  (Resp. at 42-46.)

Petitioner also argues the conviction unfairly prejudiced him during the second stage and denied him his constitutional right to a fundamentally fair sentencing proceeding.  (Pet. at 54.)  Respondent contends Petitioner's claim as it relates to the second stage of his trial is unexhausted.  (Resp. at 43.)  A review of Petitioner's brief on direct appeal confirms Petitioner did not raise a sufficiency of the evidence argument as it relates to his second stage proceedings.  (Appellant's Brief, Case No. D-2003-829, pp. 19-25.)  Petitioner declined to address Respondent's exhaustion argument in his Reply before this Court.  Accordingly, the Court concludes Petitioner's claim as it relates to the second stage of his trial is unexhausted, applies "anticipatory procedural bar," and denies relief.  Anderson, 476 F.3d at 1139 n.7.

Turning to Petitioner's exhausted ground for relief, a sufficiency of the evidence claim requires a habeas court to determine, "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979); <u>see also</u> <u>Brown v. Sirmons</u>, 515 F.3d 1072, 1088-89 (10th Cir. 2008). It is the responsibility of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." <u>Jackson</u>, 443 U.S. at 319. Because the OCCA applied the <u>Jackson</u> standard on direct appeal,[7] AEDPA deference applies. <u>Matthews</u>, 577 F.3d at 1183. On habeas review, a sufficiency of the evidence challenge is a mixed question of law and fact, requiring the Court to apply both 28 U.S.C. § 2254(d)(1) and (d)(2). <u>Maynard v. Boone</u>, 468 F.3d 665, 673 (10th Cir. 2006); <u>see also</u> <u>Brown</u>, 515 F.3d at 1089. The Court's review is "sharply limited, and a court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." <u>Brown</u>, 515 F.3d at 1089 (internal quotation marks and citations omitted).

A sufficiency of the evidence challenge begins "with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n.16. Petitioner's conviction for first degree rape required the State to prove, beyond a

---

[7] The OCCA did not directly cite <u>Jackson</u>, but it applied the appropriate standard and denied relief. The OCCA determined, "'whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.'" <u>Warner</u>, 2006 OK CR 40, ¶ 35, 144 P.3d at 863 (<u>quoting</u> <u>Spuehler v. State</u>, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-04). Failing to specifically cite <u>Jackson</u> does not affect this Court's level of deference. <u>See</u> <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002); <u>Matthews v. Workman</u>, 577 F.3d 1175, 1183 n.2 (10th Cir. 2009).

reasonable doubt: (1) sexual intercourse; (2) with a person who was not the spouse of the defendant; and (3) where the Petitioner was over the age of eighteen, and the victim was under the age of fourteen. (VI O.R. at 1092.) See also 21 Okla. Stat. § 1111(A)(1); Instruction No. 4-120, OUJI-CR (2d). The element of sexual intercourse was defined as "the actual penetration of the vagina or anus by the penis. Any penetration, *however slight*, is sufficient." (VI O.R. at 1093) (emphasis added); 21 Okla. Stat. § 1113; Instruction No. 4-122, OUJI-CR (2d). Petitioner argues that because the physical evidence supports only external injuries to the Victim's rectum, there is no support for the element of actual penetration. Further, Petitioner contends the State failed to submit sufficient evidence that the injury was caused by a penis. (Pet. at 51-53.)

Pursuant to § 2254(e) and this Court's review of the record, the following excerpt from the OCCA's opinion adequately summarizes the evidence:

> As the victim in this case was an infant, we have no personal testimony on the element of penetration and rely only on the medical evidence offered. Robin Justice, R.N., testified that in examining the victim in the emergency room she observed bright red blood in her diaper, which indicated a recent injury. She also observed tears around the victim's rectum. Dr. McCreight, the examining physician, testified he also observed blood in the victim's diaper and that the skin around her rectum was stained with blood. He was also of the opinion that the blood indicated a recent injury. Additionally, he observed tears in the rectum.
>
> Ann Morie Spencer, M.D., pediatric emergency physician at Children's Hospital, did not examine the victim but viewed photographs of her injuries. Dr. Spencer testified she observed lacerations around the rectum. She said that kind of injury indicated "some sort of force to that area" shortly before death and that the condition of the area indicated that the amount of force used was considerable, as that area does not tear easily. She also testified that the rectal muscle appeared to be transected or cut through and that such an injury was

not the type normally associated with hard stools.  On cross-examination, Dr. Spencer admitted she could not tell for sure what caused the victim's injuries.

Dr. Chai Choi of the Medical Examiner's office testified that while performing the autopsy she observed several tears around the victim's rectum. She said the tears indicated the skin around the rectum had been "overstretched" from pressure being placed against the area.  Dr. Choi said there was no way for her to determine what caused the injury, but she could not exclude an adult penis as the cause.  On cross-examination, Dr. Choi said the injuries to the victim's rectum were all external.

Although not a medical expert witness, Elaine Taylor, forensic chemist with the Oklahoma City Police Department, testified in her examination for DNA analysis, she found no evidence of semen in the diaper or the victim's clothes.

Warner, 2006 OK CR 40, ¶¶ 36-39, 144 P.3d at 863.

The Court recognizes that the question before it is not whether the jury's finding, based upon inferences and conclusions from the evidence, is reasonable.  Rather, the question on habeas review is whether the OCCA's determination that a rational juror could find penetration is, itself, unreasonable.  Cf. Young v. Sirmons, 486 F.3d 655, 666, n.3 (10th Cir. 2007) (describing the standard of review for sufficiency of the evidence challenges on habeas review as "'deference squared'").  The Court concludes the OCCA's determination is not unreasonable.  The jury in Petitioner's case was presented with physical evidence that Victim suffered multiple tears to her rectum while in the sole care of Petitioner.  Further, the State presented evidence that Petitioner cued a video cassette to a pornographic scene while in the bedroom in which Victim was found.  (Tr., Vol. III, pp. 674-75.)  Two different lubricants were found on top of the television.  (Id. at 670.)  The State presented evidence that a lubricant may have been applied to Victim's genital region.  (Id. at 653-54.)  From this

evidence, a rational jury was able to find the elements of first degree rape beyond a reasonable doubt.  In sum, the OCCA's determination, based upon the evidence presented at trial, was not an unreasonable application of, nor contrary to, clearly established federal law.  Petitioner's fifth ground for relief is denied.

### 6.    Ground Six:  Child Abuse Murder Jury Instructions

In his sixth ground for relief, Petitioner argues the trial court's failure to instruct the jury that child abuse murder requires an intent to injure violated his rights under the federal constitution.  Petitioner filed a motion to define "willful" as requiring "an intent to injure." (III O.R. at 441-43; VI O.R. at 984.)  However, the jury was given the following instruction:

> No person may be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt each element of the crime.  These elements are:
>
> <u>First</u>, the death of a child under the age of eighteen;
> <u>Second</u>, the death resulted from the willful or malicious injuring or torturing or maiming or using of unreasonable force;
> <u>Third</u>, by the defendant.

(VI O.R. at 1090.)  Willful was defined in the instructions as:  "Purposeful. 'Willful' is a willingness to commit the act or omission referred to, but does not require any intent to violate the law or to injure another or to acquire any advantage."  (<u>Id.</u> at 1091.)

Petitioner first argues that the OCCA's application of <u>Fairchild v. State</u>, 1999 OK CR 49, 998 P.2d 611, in which the OCCA clarified that child abuse murder under 21 Okla. Stat. § 701.7(C) as a general intent crime, violates ex post facto principles of the Fourteenth Amendment.  Alternatively, Petitioner submits that by being convicted of a crime without

a specific intent requirement, he has been denied due process. (Pet. at 55-62.) Petitioner presented his claims on direct appeal and the OCCA denied relief on the merits. Warner, 2006 OK CR 40, ¶¶ 78-81, 144 P.3d at 870-71. Respondent argues that Petitioner has failed to demonstrate the OCCA's determination is contrary to, or an unreasonable application of, clearly established federal law. (Resp. at 46-51.)

### a. Ex Post Facto Challenge

In Fairchild, the OCCA clarified the mens rea requirement under Oklahoma's child abuse murder statute. Previously, in Workman v. State, 1991 OK CR 125, ¶ 22, 824 P.2d 378, 383, the OCCA concluded child abuse murder is a general intent crime. Subsequently, and without overruling Workman, the OCCA held that child abuse murder contained a "specific intent requirement." Hockersmith v. State, 1996 OK CR 51, ¶ 12, 926 P.2d 793, 795. Faced with a conflict, the OCCA in Fairchild held Hockersmith to be an "aberration" and overruled its holding that child abuse murder is a specific intent crime. Fairchild, 1999 OK CR 49, ¶ 45, 998 P.2d at 622. Fairchild made it clear that, under Oklahoma law, child abuse murder "does not *require* a specific intent to injure, but only a general intent, included in the term willfully, to commit the act which causes the injury." Id. ¶ 51, 998 P.2d at 622-23 (emphasis omitted).

Judicial decisions may violate ex post facto principles of due process. Bouie v. City of Columbia, 378 U.S. 347, 353 (1964) ("[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, § 10, of the Constitution forbids."); see also Calder v. Bull, 3 U.S. 386 (1798)

(outlining four categories of ex post facto laws).  However, in <u>Rogers v. Tennessee</u>, the Court clarified that <u>Bouie</u> did not "incorporate jot-for-jot the specific categories of <u>Calder</u> into due process limitations on the retroactive application of judicial decisions."  532 U.S. 451, 459 (2001).  Instead, "a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue."  <u>Id.</u> at 462 (internal quotation marks and citation omitted).  Thus, ex post facto claims derived from judicial decision making are analyzed in the context of the Due Process Clause.  <u>Sallahdin v. Gibson</u>, 275 F.3d 1211, 1228 (10th Cir. 2002).  <u>See also</u> <u>Hawkins v. Mullins</u>, 291 F.3d 658, at 664 n.2 (10th Cir. 2002) ("[Petitioner's] argument implicates due process concerns instead, because [Petitioner] challenges the state appellate court's decision rather than a legislative act.").  Importantly, "the Due Process Clause does not, depending upon the context of the judicial decision at issue, necessarily incorporate all of the specific prohibitions of the Ex Post Facto Clause."  <u>Selsor v. Workman</u>, 644 F.3d 984, ___, 2011 WL 1632101, at *23 (10th Cir. 2011).

Petitioner argues, as he did on direct appeal, that application of <u>Fairchild</u> violates ex post facto principles of due process because at the time of the crime for which he was charged, <u>Fairchild</u> had not yet been decided.[8]  The OCCA, relying on <u>Evans v. Ray</u>, 390 F.3d 1247 (10th Cir. 2004), concluded <u>Fairchild</u> did not change the law such that its application

---

[8] Victim died on August 22, 1997, and the OCCA decided <u>Fairchild</u> on December 7, 1999. <u>Fairchild</u>, 1999 OK CR 49, 998 P.2d 611.

would violate the ex post facto prohibition. Warner, 2006 OK CR 40, ¶¶ 79-80, 144 P.3d at 871. In Evans, the Tenth Circuit concluded the OCCA's determination that retroactive application of Fairchild did not violate ex post facto principles was reasonable because "Fairchild was not unexpected and indefensible in light of the plain language of the statute and Oklahoma case law in force as of the time the crime was committed." Evans, 390 F.3d at 1254. As discussed above, the state of Oklahoma law on the mens rea requirement of child abuse murder was unclear and an opinion resolving the conflict "was eminently predictable." Id. The state court's decision to reinforce the general intent requirement from Workman "was certainly defensible in light of the statutory language of Okla. Stat. tit. 21, § 701.7(C) and Oklahoma's long history of interpreting the statutory requirement of 'willful' as a general intent requirement rather than as a specific intent requirement." Id. Petitioner fails to demonstrate how the OCCA's determination is contrary to, or an unreasonable application of clearly established law, particularly in light of the Tenth Circuit's decision in Evans. Accordingly, Petitioner's claim based on ex post facto principles is without merit and denied.

### b.    Child Abuse Murder as a General Intent Crime

Petitioner argues that the omission of actual or implied malice in the offense of child abuse murder results in a denial of due process because the crime becomes a strict liability offense. The OCCA addressed this argument in its decision:

> [Petitioner] argues that by being convicted of a crime that did not possess an element of either implied or express malice, he has been denied due process by a strict liability offense. In Gilson v. State, 2000 OK CR 14, ¶ 41, 8 P.3d 883, 903, cert. denied, 532 U.S. 962, 121 S.Ct. 1496, 149 L.Ed.2d 381 (2001), we stated the child abuse murder statute should be interpreted in the same

33

manner as the felony murder doctrine. Just as proof of the underlying felony is needed to prove the intent necessary for felony murder, proof of the underlying act of child abuse is needed to prove the intent necessary for a child abuse murder conviction. <u>Id.</u> Because there is an intent requirement for child abuse, child abuse murder is not a strict liability crime. Accordingly, this assignment of error is denied.

<u>Warner</u>, 2006 OK CR 40, ¶ 81, 144 P.3d at 871.

Petitioner does not attempt to demonstrate how the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law. Instead, Petitioner argues that the common law definition of murder requires an intent to injure as an element of the offense and the treatment of child abuse murder as murder in the first degree without a specific intent violates due process. (Pet. at 62.) This Court has previously addressed a nearly identical argument and denied relief. <u>Hernandez v. Addison</u>, 2006 WL 2489349, No. CIV-06-141-R (W.D. Okla. Aug. 28, 2006) (unpublished), <u>aff'd</u>, 217 F.App'x 817, 819 (10th Cir. Feb. 22, 2007) (unpublished). Petitioner fails to submit clearly established federal law that supports his claim that Oklahoma's general intent requirement in its child abuse murder statute violates due process. Additionally, decisions from the Tenth Circuit confirm the appropriateness of the OCCA's analogy between the operation of felony murder and child abuse murder. <u>See</u> <u>Gilson v. Sirmons</u>, 520 F.3d 1196, 1211-12 (10th Cir. 2008); <u>Malicoat v. Mullin</u>, 426 F.3d 1241, 1254-55 (10th Cir. 2005); <u>Workman v. Mullin</u>, 342 F.3d 1100, 1109-15 (10th Cir. 2003).

The OCCA's determination that the general intent requirement in its child abuse murder statute does not violate due process is not contrary to, nor an unreasonable application of, clearly established federal law. Petitioner's sixth claim for relief is denied.

### 7.  Ground Seven:  Constitutionality of Child Abuse Murder

Petitioner's seventh ground for relief raises a challenge under Enmund v. Florida, 458 U.S. 782 (1982), and Tison v. Arizona, 481 U.S. 137 (1987).  Petitioner argues his sentence of death is unconstitutionally disproportionate under the Eighth Amendment because the crime of child abuse murder does not require a finding that he intended harm or death to the child.  (Pet. at 62-65.)  Further, according to Petitioner, his death sentence does not "measurably contribute" to the societal purposes of deterrence or retribution.  Gregg v. Georgia, 428 U.S. 153, 183 (1976) ("The death penalty is said to serve two principal social purposes:  retribution and deterrence of capital crimes by prospective offenders."); see also Enmund, 458 U.S. at 798.  The OCCA considered Petitioner's claim and declined to overrule precedent that an analysis under Enmund/Tison is unnecessary when a defendant "actually killed the victim by his/her own hand."  Warner, 2006 OK CR 40, ¶ 116, 144 P.3d at 877.  Additionally, the OCCA noted the Tenth Circuit's decision in Workman, 342 F.3d at 1114-15, also rejected Petitioner's argument on habeas review.  Id.  Respondent argues the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.  (Resp. at 52-55.)

In Enmund, the Court concluded that the Eighth Amendment did not permit a death sentence for an individual who participated in a felony that resulted in two murders, but who

himself "did not kill or intend to kill." Enmund, 458 U.S. at 798. However, the Court later qualified the rule from Enmund. "[M]ajor participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Tison, 481 U.S. at 158. Importantly, neither Enmund nor Tison prohibit a state from imposing a death sentence when the convicted individual actually killed the victim.

In Workman, the Tenth Circuit determined that the constitutional requirements of Enmund/Tison are satisfied "in felony murder cases in which the defendant actually killed his victim." Workman, 342 F.3d at 1114. Like Petitioner, Workman was convicted and sentenced to death for child abuse murder. Workman asserted that the jury instructions in his case did not require the jury to make a finding as to his culpability such that he should be eligible for the death penalty. Id. at 1109. The Tenth Circuit concluded, "We hold that no further analysis is required by a court under Enmund or Tison because the Eighth Amendment is not offended in this case of felony murder after the jury's finding that Workman actually killed his victim." Id. at 1115. See also Malicoat, 426 F.3d at 1254-55 (holding that a finding that Malicoat willfully committed child abuse and actually killed victim is sufficient under Enmund/Tison Eighth Amendment limitations on the application of capital punishment). In the instant case, as explained in the OCCA's opinion, "the evidence supports a finding that [Petitioner] actually killed the victim." Warner, 2006 OK CR 40, ¶ 116, 144 P.3d at 877. Petitioner has not challenged the OCCA's conclusion, and this Court concludes the record amply supports the OCCA's determination.

The OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law. Petitioner's seventh ground for relief is denied.

### 8. Ground Eight: Admission of Statements to Det. Edwards

In his eighth ground for relief, Petitioner argues the trial court's admission of his statements to Det. Edwards violated his constitutional rights under: (1) the Fourth Amendment; (2) <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966); and (3) the right to counsel from the Fifth and Sixth Amendments. (Pet. at 65-78.) Petitioner presented this claim on direct appeal and the OCCA denied relief on the merits. <u>Warner</u>, 2006 OK CR 40, ¶¶ 41-60, 144 P.3d at 863-67. Respondent argues the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law. (Resp. at 55-66.)

On the day of the homicide, Detectives Mullinex and Griffin interviewed Petitioner at the police station, during which time Petitioner was placed under arrest for murder. (Tr., Vol. V, pp. 952-53; Court's Exhibit No. 4, p. 45.) The State charged Petitioner with murder and first degree rape in a felony information and a magistrate issued an arrest warrant on August 26, 1997. (I O.R. at 1-3.) On August 28, 1997, Det. Edwards visited Petitioner in custody at the County Jail to see if Petitioner would give a statement on the separate crime of child abuse of Petitioner's daughter, VW. (Tr., Vol. VII, pp. 1332-34.) Before taking Petitioner to the police department for an interview, Det. Edwards advised Petitioner of his rights under <u>Miranda</u>. Petitioner waived his rights and agreed to speak with Det. Edwards. (<u>Id.</u> at 1334-35.) Once at the police station, Det. Edwards informed Petitioner that he was not there to speak about the homicide, but rather to discuss abuse of Petitioner's child. (<u>Id.</u>

at 1336.)  In the beginning of Petitioner's statement, Det. Edwards advised Petitioner that "You can stop at any time, do you understand that?  And you may have an attorney present, if you want one.  And at any time in the conversation, you don't want to talk anymore, you can say I don't want to talk anymore." (Ct. Exhibit 5, p. 6).  Petitioner's statements from the interview were used by the State to prove the continuing threat aggravating factor in second stage.  (Tr., Vol. VII, pp. 1369-70.)

### a.    Fourth Amendment Challenge

Petitioner's claim under the Fourth Amendment is not cognizable on federal habeas review.  Stone v. Powell, 428 U.S. 465 (1976).  "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  Id. at 481-82; see also Smallwood v. Gibson, 191 F.3d 1257, 1265 (10th Cir. 1999) (holding Stone bars consideration of a Fourth Amendment claim raised on habeas if petitioner had a full and fair opportunity to litigate claim in state court).  The record reflects and Petitioner does not dispute that he had a full and fair opportunity to litigate this Fourth Amendment claim in state court.  Indeed, Petitioner raised his claim in trial and appellate proceedings.  As a result, this Court may not consider the claim on habeas corpus review.

In addition, Petitioner's claim has no merit because the OCCA's resolution of the claim is a reasonable application of clearly established federal law.  In Gerstein v. Pugh, 420 U.S. 103 (1975), the Supreme Court held that "the Fourth Amendment requires a judicial

determination of probable cause as a prerequisite to extended restraint of liberty following arrest." Id. at 114. Later, the Court determined that a probable cause determination "within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein." Cnty of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). After 48 hours, the State bears the burden of demonstrating an emergency or other extraordinary circumstance that would explain the delay in providing a probable cause determination. Id. at 57. However, the Supreme Court has declined to specify the appropriate remedy for this type of Fourth Amendment violation. Powell v. Nevada, 511 U.S. 79, 85 n.* (1994) (noting that whether suppression is the appropriate remedy when McLaughlin's 48 hour rule is violated "remains an unresolved question.").

The OCCA's opinion accurately summarizes the law and facts relevant to Petitioner's claim:

> [T]he record shows that on the day of the homicide, August 22, 1997, [Petitioner] was interviewed by detectives during which time he was arrested. On August 26, 1997, a felony information, charging [Petitioner] with the murder and first degree rape of the victim, was filed and an arrest warrant was issued. On August 28, 1997, Detective Edwards interviewed [Petitioner] on his possible abuse of his daughter [VW]. On September 4, 1997, [Petitioner] made his initial appearance before a magistrate on the first degree murder and rape charges.

> A criminal defendant is constitutionally entitled to a probable cause hearing within 48 hours after his arrest. See County of Riverside v. McLaughlin, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). A delay of more than 48 hours is presumptively unreasonable. Black v. State, 1994 OK CR 4, ¶ 6, 871 P.2d 35, 39, citing McLaughlin, 500 U.S. at 57, 111 S.Ct. at 1670, 114 L.Ed.2d at 63. After the expiration of the 48-hour period, the burden of proof shifts to the State to demonstrate "the existence of a bona fide emergency or

other extraordinary circumstance," to rebut the presumption of unreasonableness. Id. "The longer the time a defendant sits in jail without some form of probable cause hearing, the more likely the detention will become oppressive to him and the more likely he will be coerced into giving evidence he otherwise would not give . . . ." Id. 1994 OK CR 4, ¶ 7, 871 P.2d at 39.

Warner, 2006 OK CR 40, ¶¶ 42-43, 144 P.3d at 864. Respondent acknowledges that Petitioner's probable cause determination occurred more than 48 hours after his arrest. (Resp. at 59.) Id. ¶ 44, 144 P.3d at 864. The OCCA applied harmless error review and determined Petitioner was not entitled to relief.

> Although the probable cause determination in this case was not made timely, it was made prior to [Petitioner's] interview with Detective Edwards. Further, the interview with Detective Edwards concerned the abuse of [VW], not the homicide victim. [Petitioner] claims his statements to Detective Edwards should have been suppressed as he was influenced by the coercive atmosphere. [Petitioner] does not explain his claim. Our review of the record shows [Petitioner] was not coerced into giving evidence he otherwise would not have given. The trial court found his statements were made knowingly and voluntarily. Therefore, the failure to have the probable cause determination timely was harmless error as [Petitioner's] statements were not a product of an illegal detention.

Warner, 2006 OK CR 40, ¶ 45, 144 P.3d at 864. Petitioner argues the probable cause determination did not occur until September 4, 1997, when the felony information was filed. (Pet. at 68.) Under this time line, Petitioner's statements to Det. Edwards would have occurred more than 48 hours after his arrest, but before a required probable cause determination. (Pet. at 68.) However, the OCCA concluded that the probable cause determination occurred on August 26, 1997, when the felony information was signed by a state court judge. Warner, 2006 OK CR 40, ¶¶ 42-45, 144 P.3d at 864. Petitioner has neither

rebutted the presumption of correctness afforded state court factual determinations, nor cited controlling authority for the proposition that a probable cause determination is not "official" until the warrant or information is filed with a state court. Therefore, the OCCA's conclusion that Petitioner's interview with Det. Edwards occurred after a probable cause determination, and therefore outside the scope of the Gerstein/Riverside delay, is reasonable in light of the evidence presented at the state court proceeding.

Petitioner also claims he suffered prejudice as a result of his confinement, but does not identify the specific prejudice, apart from arguing that a prolonged detention may result in oppression or coercion leading to the disclosure of evidence he would otherwise not give. (Pet. at 69.) As discussed below, the OCCA determined Petitioner's statements were not the product of coercion, and this Court considers the OCCA's conclusion reasonable. Petitioner's claim under the Fourth Amendment fails.

### b.    Miranda v. Arizona

Petitioner also argues the admission of his statements violated his Fifth Amendment rights because Det. Edwards forgot to have Petitioner sign a written waiver and failed to give complete Miranda warnings once at the police department interview room. (Pet. at 70-73.) The OCCA summarized the testimony from the Jackson v. Denno, 378 U.S. 368 (1964),[9] hearing:

---

[9] Under Jackson v. Denno, a defendant who objects to the admission of a confession on voluntariness grounds has a constitutional right to a hearing in which the trial court will make an independent and reliable determination of voluntariness before the confession is submitted to the jury. 378 U.S. at 376-77.

> Detective Edwards testified that before he took [Petitioner] out of his cell for the interview, he read [Petitioner] his Miranda rights from a card he carried in his pocket. Edwards testified that [Petitioner] indicated he understood his rights and wanted to speak with the detective. Edwards said he then checked [Petitioner] out of the jail, walked him across the street to an interview room at the police department, started the videotape, and proceeded to interview [Petitioner]. Edwards testified he told [Petitioner] he was there to interview him about abuse to [VW], not anything related to the homicide of [Victim]. Edwards said once he and [Petitioner] arrived at the interview room, he went over [Petitioner's] rights with him again, although he did not give him the full Miranda warning again.

Warner, 2006 OK CR 40, ¶ 47, 144 P.3d at 864-65. The OCCA concluded the record supported the trial court's ruling that Det. Edwards gave full Miranda warnings prior to removing Petitioner to the police station, and that Petitioner voluntarily and knowingly made his statements. Id. ¶ 49. This Court's review of the record confirms the reasonableness of the OCCA's determination. That the subsequent warning was not complete does not render the OCCA's determination unreasonable. As a result, Petitioner's claim under Miranda fails.

### c.   Fifth Amendment Right to Silence

Petitioner next argues that his right to silence, which he invoked at the end of the interview with Detectives Mullenix and Griffin on the day of the homicide, was not scrupulously honored when Det. Edwards initiated contact with Petitioner days later to discuss a separate charge. (Pet. at 73-75.) Under Michigan v. Mosley, 423 U.S. 96, 104 (1975), "[A]dmissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Law enforcement in Mosley did not violate Miranda because (1) at the time the defendant invoked his right to remain silent, questioning ceased; (2) a significant

interval of more than two hours separated the two interrogations; (3) a different officer conducted the second interrogation; (4) the defendant received a new set of Miranda warnings; (5) police conducted the second interrogation in a separate location; and (6) the subject of the second interrogation was unrelated to the first. Id. at 104-05.

The OCCA applied Mosley and denied relief:

> In the present case, the moment [Petitioner] told Detective Griffin he did not want to talk to police, questioning ceased. [Petitioner] was not interviewed again for approximately five days and the second interview was conducted by a different officer. While the second interview by Detective Edwards was conducted in the same interview room where [Petitioner] had been questioned by Detective Griffin, [Petitioner] was given the full Miranda warning before the second interview. It was not until [Petitioner] waived his rights that Detective Edwards checked him out of jail and took him to the police station for interrogation. Further, the second interview involved a crime entirely separate from the homicide, which was the subject of the first interview.

> Under the totality of the circumstances in this case, the police "scrupulously honored" [Petitioner's] invocation of his right to remain silent, and the trial court did not err in denying the motion to suppress.

Warner, 2006 OK CR 40, ¶¶ 52-53, 144 P.3d at 865-66.

Petitioner does not contest the OCCA's conclusion that the first three considerations from Mosley weigh in favor of the State. (Pet. at 74.) Instead, Petitioner argues Det. Edwards did not scrupulously honor his right to remain silent because he was not given a fresh set of proper Miranda warnings, the second interrogation occurred in the same location, and the subject matter of the two interrogations were similar. However, as noted above and by the OCCA, Det. Edwards testified that Petitioner was given and waived his Miranda warnings before being moved to the police station for the interview. (VII O.R. at 1334-36);

Warner, 2006 OK CR 40, ¶ 47, 144 P.3d at 864-65.  Further, the subject matter of the second interrogation – possible abuse of Petitioner's children – was sufficiently distinct from the homicide and rape of Victim.  Petitioner has failed to demonstrate the OCCA's determination is an unreasonable application of clearly established federal law.

> **d.      Right to Counsel Violation under the Fifth and Sixth Amendments**

Petitioner asserts his right to counsel under the Sixth Amendment was violated upon interrogation by Det. Edwards.  Under the Sixth Amendment, the right to counsel attaches "at or after the time that judicial proceedings have been initiated against him 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" Brewer v. Williams, 430 U.S. 387, 398 (1977) (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972)).  At that point, "a defendant [has] the right to have counsel present at all 'critical' stages of the criminal proceedings", which includes state interrogation.  Montejo v. Louisiana, 556 U.S. ___, ___, 129 S.Ct. 2079, 2085 (2009).  The right to counsel under the Sixth Amendment is "offense specific" and "cannot be invoked once for all future prosecutions." McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); see also Texas v. Cobb, 532 U.S. 162, 167-68 (2001).   Petitioner's right to counsel with respect to the homicide of

Victim attached upon the filing of the formal charges on August 26, 1997. (O.R. at 1.)[10] The

OCCA determined:

> At the time of the interview by Detective Edwards, charges had been filed against [Petitioner] for the rape and murder of [Victim], and counsel had been appointed in that case. Charges had not been filed for the abuse of [VW]. Therefore, [Petitioner's] Sixth Amendment right attached only to the rape and murder charges. Any request for an attorney during the interview with Detective Edwards pertaining to the abuse of [VW] was not an invocation of [Petitioner's] right to counsel in the present case.

Warner, 2006 OK CR 40, ¶ 56, 144 P.3d at 866.

Petitioner argues that his Sixth Amendment right to counsel should also have applied

to the abuse of VW because that offense was used during the second stage of his capital

murder prosecution. (Pet. at 76-77.) In support, Petitioner relies upon Upton v. Texas, 853

S.W.2d 548 (Tex. Crim. App. 1993), which is neither clearly established federal law as

determined by the United States Supreme Court, nor helpful for Petitioner. Texas arrested

and charged Upton with car theft and burglary, at which time Upton's Sixth Amendment

right to counsel for the two offenses attached. Id. at 555. Subsequently, upon the initiation

of questioning by law enforcement, Upton made incriminating statements that resulted in a

charge of capital murder. The Texas Court of Criminal Appeals held that the theft and

burglary offenses were so closely related to the capital murder offense that McNeil's offense

---

[10] Petitioner also argues he invoked his right to counsel with respect to the homicide during the beginning of his statement to Det. Edwards. (Pet. at 75.) The recording is not entirely clear whether Petitioner invoked his right to counsel and the OCCA did not render a factual determination on the matter. As this Court discusses, whether Petitioner invoked his right to counsel pursuant to the homicide of Victim during the interview does not affect the OCCA's determination because Petitioner's right to counsel did not attach for the uncharged crime of abuse of VW.

specific holding was inapplicable. As a result, Upton's incriminating statements were inadmissible absent representation by counsel and a valid waiver. Id. at 555-56. In Petitioner's case, the abuse of VW was not so closely related to the rape and homicide of Victim. Those incidents of abuse involved a separate child and were not connected to commission of the rape and murder of Victim. That the State used the abuse of VW to support an aggravating factor does not render the offenses so closely related that McNeil is applicable.

The OCCA also rejected Petitioner's argument that he invoked his Fifth Amendment right to counsel during the interview with Det. Edwards:

> Additionally, [Petitioner] argues that even if this Court finds the Sixth Amendment right to counsel had not attached to the [VW] case, his Fifth Amendment right to counsel was invoked when he requested counsel during the interview. The Fifth Amendment right to have counsel present during custodial interrogation is not invoked unless a suspect clearly and unambiguously asserts it. Valdez, 1995 OK CR 18, ¶ 30, 900 P.2d at 373 citing Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Only those statements that can "reasonably be construed to be an expression of a desire for the assistance of an attorney" are considered actual invocations of the right to counsel. Id. All circumstances existing prior to the purported invocation can be used to help determine whether an accused unambiguously and unequivocally requested the presence of an attorney. Id., 1995 OK CR 18, ¶ 30, 900 P.2d at 374. The Fifth Amendment right to have counsel present during custodial interrogation is non-offense-specific. Once it is invoked, police may not initiate interrogation concerning any offense, past or present, charged or uncharged. Id., 1995 OK CR 18, ¶ 28, 900 P.2d at 373 citing McNeil v. Wisconsin, 501 U.S. at 176, 111 S.Ct. at 2208.

> At the *in-camera* hearing on the Motion to Suppress, Detective Edwards testified on cross-examination that during the interview [Petitioner] said, "do I need a lawyer present at this time?" [Petitioner] testified that he tried to say he wanted counsel, but was cut off from doing so by the detective's questions. The trial judge stated he had listened to the tape three different

times, and he did not hear the defendant ask for a lawyer. The judge noted that [Petitioner] said, "I'd like" and then continued to talk with the detective. Our review of the record supports the trial court's finding. [Petitioner] did not make a clear and unequivocal request for counsel. <u>See</u> <u>Valdez</u>, 1995 OK CR 18, ¶¶ 31-32, 900 P.2d at 374. <u>See also</u> <u>LaFevers v. State</u>, 1995 OK CR 26, ¶¶ 6-7, 897 P.2d 292, 299, <u>cert. denied</u>, 516 U.S. 1095, 116 S.Ct. 820, 133 L.Ed.2d 763 (1996). While there is a point on the videotape of the interview where both [Petitioner] and the detective talk at the same time, [Petitioner's] continued conversation with the detective confirms the finding that he did not request the assistance of counsel and that he wished to talk with the detective. Accordingly, admission of [Petitioner's] statements did not violate his Fifth Amendment right to counsel.

<u>Warner</u>, 2006 OK CR 40, ¶¶ 58-59, 144 P.3d at 866-67.

Petitioner fails to rebut the presumption of correctness afforded to the OCCA's factual determination that Petitioner did not invoke his Fifth Amendment right to counsel during Detective Edward's interrogation. This Court's review of the video tape also confirms the reasonableness of the OCCA's determination.

### e.    Conclusion

Petitioner has failed to demonstrate the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Petitioner's eighth ground for relief is denied.

### 9.    Ground Nine:  Prior "Bad Acts" Evidence

In his ninth ground for relief, Petitioner argues the admission of certain evidence rendered his trial fundamentally unfair in violation of the Fourteenth Amendment. Specifically, Petitioner complains the trial court improperly admitted evidence of: (1) Petitioner's multiple requests of anal sex from Victim's mother, Shonda Waller, in the

weeks before the homicide; (2) a pornographic videotape in the videocassette recorder of Petitioner's bedroom; and (3) statements from Petitioner's son that Petitioner sometimes whipped him with a belt or his hand.  (Pet. at 80.)  Petitioner raised his argument on direct appeal, and the OCCA denied relief based upon state evidentiary law.  Warner, 2006 OK CR 40, ¶¶ 61-70, 144 P.3d at 867-69.[11]  Respondent argues the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.  (Resp. at 66-73.)

A habeas court does not disturb state evidentiary determinations regarding the admission of prior bad acts, crimes, or prior offenses "unless the prejudice flowing from such evidence is so great as to constitute a denial of federal constitutional rights by rendering the trial fundamentally unfair."  Smallwood, 191 F.3d at 1277.  In the absence of an instruction to the jury to disregard mistakenly admitted evidence, the Court considers the record as a whole in determining whether the evidence resulted in fundamental unfairness.  Id.  After reviewing the contested evidence in light of the entire trial, the Court concludes its admission did not render Petitioner's trial fundamentally unfair.

Petitioner argues that the OCCA failed to properly identify the statements as "other bad acts" evidence which would have required the State to comply with Burks v. State, 1979

---

[11] Petitioner does not argue that the Court should review the OCCA's determination de novo because it failed to address Petitioner's fundamental fairness argument on direct appeal.  But see Knighton v. Mullin, 293 F.3d 1165, 1171 (10th Cir. 2002) ("Although [Petitioner] did raise this constitutional due process argument on direct appeal, the Oklahoma appellate court did not specifically address it.  We, therefore, review this habeas claim de novo.").  As discussed below, Petitioner's claim of fundamental unfairness does not survive under AEPDA deference or de novo review.

OK CR 10, ¶ 2, 594 P.2d 771, 772, <u>overruled in part on other grounds</u>, <u>Jones v. State</u>, 1989

OK CR 7, 772 P.2d 922.[12]  There are two reasons Petitioner's argument does not affect this

Court's analysis.  First, the OCCA's conclusion that the evidence did not fall under 12 Okla.

Stat. § 2404(B) is a state evidentiary decision that is outside the scope of habeas review.

<u>McGuire</u>, 502 U.S. at 67-68.  Secondly, any failure of the State to provide Petitioner with

notice of its intent to use the evidence carries little weight in a fundamental fairness analysis.

Petitioner was well aware of the evidence, particularly because this was his third trial.  The

admission of the evidence does not offend principles of due process.

In the first stage of trial, Shonda Waller testified that in the two weeks leading up to

the day of the homicide, Petitioner requested anal sex three to five times.  (Tr., Vol. III, pp.

725-26.)  Ms. Waller also testified that she and Petitioner had regular sexual relations during

the three months she lived at his house.  (<u>Id.</u> at 724.)  However, Ms. Waller stopped those

relations for the most part, and Ms. Waller and Petitioner had sexual intercourse only once

in the two weeks before Victim's death.  (<u>Id.</u> at 725.)  Initially, the trial court granted

Petitioner's pretrial motion to exclude testimony relating to his requests for anal sex.

However, once it became apparent that Petitioner's theory of the case was that he was not

responsible for the rape of Victim, the State asked the trial court to reconsider its pretrial

ruling.  As a result, the trial court determined Petitioner's requests were relevant to the issue

of Petitioner's mental state and identity as the perpetrator.  (<u>Id.</u> at 639-40; 702-13.)  On direct

---

[12] Under <u>Burks</u>, the State must give pretrial notice of other crimes or bad acts it intends to
introduce as evidence.  <u>Eizember v. State</u>, 2007 OK CR 29, ¶ 75, 164 P.3d 208, 230.

appeal, the OCCA determined that the statements were relevant to the issue of Petitioner's motive and intent to attempt anal intercourse with Victim and also to show Petitioner as the perpetrator. <u>Warner</u>, 2006 OK CR 40, ¶ 64, 144 P.3d at 868. The state court acknowledged the "significant" prejudicial effect of the evidence, but determined that it did not outweigh the probative value of the statements. <u>Id.</u> ¶ 66, 144 P.3d at 868.

The State introduced the testimony of Officer William Loftis to establish the presence of a pornographic recording in the videocassette player attached to the television in Petitioner's bedroom. (Tr., Vol. III, pp. 671-72.) The State's theory was that Victim was abused and killed in Petitioner's bedroom. Officer Loftis testified that the videotape as found was cued to an eight to nine minute clip of an adult love scene, with strong nudity and sexual content. The entire tape, described as six and a half to seven hours long, contained recordings of *Def Comedy Jam*, a Garth Brooks concert, and the movie *Conan the Barbarian*. (<u>Id.</u> at 673-74.) Officer Loftis also described finding a bottle of aloe vera gel and petroleum jelly in the immediate area of the television. (<u>Id.</u> at 670.) Even though defense trial counsel filed pretrial motions contesting the admissibility of the videotape, the trial court admitted it as an exhibit without objection from defense counsel. (<u>Id.</u> at 675-76.) The OCCA concluded that admission of the tape was not error because it was relevant as res gestae. <u>Warner</u>, 2006 OK CR 40, ¶ 68, 144 P.3d at 868. Admission of the videotape showed what Petitioner was watching during the period he was alone with Victim. Further, the OCCA determined, the recording was "central to the chain of events leading up to the crime and its admission gave the jury a complete picture of the entire crime." <u>Id.</u> Petitioner complains

about the admission of the videocassette but in his Petition neglects to argue how the evidence rendered his trial fundamentally unfair. (Pet. at 89.)

Rebecca Price, a child welfare worker at the Department of Human Services, testified that CW told her in an interview that Petitioner "whip[ped] him with his hand and a belt." (Tr., Vol. V, p. 1103).[13] The OCCA determined that the act of spanking or whipping a child is a form of discipline, and therefore it was "neither a crime nor a bad act." Warner, 2006 OK CR 40, ¶ 70, 144 P.3d at 869. During trial, defense counsel acknowledged that such discipline was not a bad act. (Tr., Vol. V, p. 1104.) Additionally, the OCCA concluded that the prejudicial value of the evidence did not substantially outweigh its probative value. Warner, 2006 OK CR 40, ¶ 70, 144 P.3d at 869.

The Court concludes Petitioner was not deprived of due process through the admission of the above described evidence. Each piece of the contested evidence was relevant to the State's case. Petitioner's requests for anal sex, which Ms. Waller denied, supported the theory that Petitioner was sexually frustrated. Further, the adult videocassette and lubricants helped explain Petitioner's actions and mental state during the time period Victim suffered her injuries.

Moreover, the jury was presented with compelling evidence of Petitioner's guilt. Victim was healthy at the time Ms. Waller left to get groceries. The record reflects Petitioner

---

[13] The OCCA incorrectly identified this testimony as having been introduced during the second stage. Warner, 2006 OK CR 40, ¶ 69, 144 P.3d at 868-69. This oversight is immaterial to this Court's analysis.

was the only adult supervising Victim and his two other young children. During this time period, Victim suffered the injuries which resulted in her death. Petitioner's son testified that he saw Petitioner abusing Victim shortly before her death. Dr. Chai Choi's expert medical testimony described the severe injuries Victim suffered while in the sole custody of Petitioner. Based upon the record as a whole, the Court concludes that the admission of the evidence described above did not render Petitioner's trial fundamentally unfair such that he was deprived of due process. Ground nine is denied.

### 10. Ground Ten: Evidence of Samuel McKinney

In his tenth claim for relief, Petitioner argues his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments to equal protection, due process, a jury trial, to present a defense and mitigation evidence, and to confront witnesses, were violated when the trial court excluded evidence relating to Samuel McKinney. (Pet. at 90-97.) The OCCA's opinion accurately summarizes the evidence in dispute:

> The record shows that during the testimony of Detective Mullenix, the defense sought to question the detective as to whether during the course of his investigation he learned that the victim was with McKinney the Thursday before her death, and whether he inquired of Estella Grissom, McKinney's mother, whether her son had a history of sex crimes. The prosecutor informed the court the detective's report indicated that when McKinney was 14 years old there were allegations that he had committed oral sodomy on a 5 or 6 year old boy and that McKinney "got some kind of counseling and that was the end of it." The prosecutor stated there was no evidence "of any adjudication or anything else." The court asked defense counsel if she had any evidence to show that McKinney acted in furtherance of the murder, that he was a participant in any way, that he committed any overt acts, or if there was any evidence to connect him to the case on trial. Defense counsel replied that as to the murder, there was no evidence; but as to the rape it was relevant to show that someone other than [Petitioner] could have committed the rape. The trial

court sustained the State's objection finding the proffered evidence not relevant as the rape and murder in the case occurred contemporaneously.

_Warner_, 2006 OK CR 40, ¶ 72, 144 P.3d at 869. Petitioner raised this issue as a ground for relief on direct appeal. The OCCA denied relief on the merits and Respondent argues this determination is not contrary to, nor an unreasonable application of, clearly established federal law. (Resp. at 73-86); _id._ ¶ 77, 144 P.3d at 870.

As previously discussed, a federal habeas court reviews alleged errors of state evidentiary law only for fundamental fairness. _Romano v. Gibson_, 239 F.3d 1156, 1166 (10th Cir. 2001) ("[I]t is not for [a federal habeas court] to review a state court's evidentiary rulings."). However, relief on habeas may be available if a state court unfairly applies its evidentiary rules "to prevent a defendant from presenting evidence that is critical to his defense." _Id._ The Court examines state court evidentiary rulings to determine "whether [an] error, if any, was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." _Williamson v. Ward_, 110 F.3d 1508, 1522 (10th Cir. 1997); _see also_ _Hooker_, 293 F.3d at 1238. State evidentiary decisions do not rise to a due process violation unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." _Egelhoff_, 518 U.S. at 43 (internal quotation marks and citation omitted); _see also_ _Revilla_, 283 F.3d at 1212.

Petitioner argues the excluded evidence was admissible because it showed a legitimate tendency to create a reasonable doubt of his guilt on the charge of first degree rape. On direct appeal, the OCCA concluded the evidence was properly excluded under its

rule that "evidence offered to show that some other person committed the crime charged must connect such other person with the fact; that is some overt act on the part of another towards the commission of the crime itself." Warner, 2006 OK CR 40, ¶ 73, 144 P.3d at 869. Further, in applying its rule, the OCCA concluded the evidence relating to McKinney was speculative and unsupported by the evidence presented at trial:

> The excluded evidence in the present case falls far short of showing a possible motive on McKinney's part or actions, conduct, or opportunity by McKinney toward the commission of the rape. By the time of [Petitioner's] trial, the oral sodomy allegations against McKinney were eighteen years old. There was no evidence he committed that crime or any similar crimes again. Further, the evidence in this case showed the rape and murder of the victim occurred at most moments apart. The injuries and blood on the victim's rectum were clearly visible when she was examined at the hospital emergency room. Assuming arguendo, the victim was with McKinney until Thursday afternoon, it was still over 26 hours prior to her death. According to the testimony of the medical experts, the victim's injuries were "fresh" and only hours old. Combining the excluded evidence with any inconsistencies in Shonda Waller's testimony does not connect or point to McKinney as the rapist, rather than [Petitioner]. In fact, it shows the allegation against McKinney is nothing more than mere speculation and not objectively supported by evidence that would provide the legal foundation required for this Court to recognize and instruct the jury on an affirmative defense.

Id. ¶ 75, 144 P.3d at 870.

Petitioner raises a constitutional challenge to Oklahoma's overt act requirement, arguing it improperly relieves the prosecution of its burden of proof on the issue of identity, denies the defense equal protection and a meaningful opportunity to present a complete defense, denies the right of confrontation, and prevents a defendant from rebutting the State's inferential evidence of identity. (Pet. at 95.) Petitioner raised his claim on direct appeal and

the OCCA relied upon its earlier decision in <u>Gore v. State</u>, 2005 OK CR 14, 119 P.3d 1268, and denied relief.  <u>Warner</u>, 2006 OK CR 40, ¶ 74, 144 P.3d at 869-70.

The Constitution guarantees an accused the right to present to present a complete defense.  <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324 (2006).  That right, however, is not absolute and states have "broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998).  Such rules may impermissibly interfere with a defendant's right to present a defense if they "infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve."  <u>Holmes</u>, 547 U.S. at 324-25 (internal quotation marks, citations, and alteration omitted).  Further, "the Constitution permits judges 'to exclude evidence that is "repetitive . . . , only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues."'"  <u>Id.</u> at 326-27 (<u>quoting</u> <u>Crane v. Kentucky</u>, 476 U.S. 683, 689-90 (1986), <u>quoting</u> <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986)).

In <u>Holmes</u>, the Supreme Court specifically addressed "rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged."  <u>Holmes</u>, 547 U.S. at 327.  The Supreme Court cited two treatises that acknowledge such evidence may be excluded if it is "'so remote and lack[s] such connection with the crime'" or the evidence "'does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial.'"  <u>Id.</u> (<u>quoting</u> 41

C.J.S. <u>Homicide</u> § 216, pp. 56-58 (1991), and 40A Am.Jur.2d, <u>Homicide</u> § 286, pp. 136-38 (1999)). The Court considered such rules "widely accepted" and, in a footnote, referenced Oklahoma's rule in <u>Gore</u>, 2005 OK CR 14, ¶¶ 13-24, 119 P.3d at 1272-76, as an example. <u>Holmes</u>, 547 U.S. at 327, n.*. The South Carolina rule in question excluded a defendant's evidence of a third party's alleged guilt where the prosecution produced strong evidence of the defendant's guilt, particularly when there is strong forensic evidence. <u>Id.</u> at 329. The Court held that this rule violated a defendant's right to present his defense because it was arbitrary in the sense that it did not serve to exclude evidence that has limited probative value or "a very weak logical connection to the central issues." <u>Id.</u> at 330-31.

Contrary to Petitioner's argument, Oklahoma's overt act requirement does not impermissibly restrict a defendant from presenting a meaningful defense. As explained in <u>Gore</u>, the overt act requirement "'does not prevent the defendant from presenting a defense or presenting evidence that another person may have committed the crime as long as there is some quantum of evidence, which is more than mere suspicion and innuendo, that connects the third party to the commission of the crime.'" <u>Warner</u>, 2006 OK CR 40, ¶ 74, 144 P.3d at 869-70 (quoting <u>Gore</u>, 2005 OK CR 14, at ¶ 24, 119 P.3d at 1276). The Supreme Court's decision in <u>Holmes</u>, which cites to <u>Gore</u> with approval in a footnote, confirms the OCCA's rule is not contrary to, nor an unreasonable application of, clearly established federal law. <u>See also</u> <u>Romano</u>, 239 F.3d at 1168 (concluding Oklahoma's overt act rule permissibly "prevent[s] juries from embarking on wild goose chases.").

In addition, the OCCA's application of <u>Holmes</u> is not unreasonable. The exclusion of the evidence was based upon the exact reasons deemed permissible in <u>Holmes</u>. McKinney's involvement in the rape of Victim was highly speculative and his role in the homicide was, as Petitioner conceded at trial, nonexistent. (Tr., Vol. V, p. 1031.) The evidence overwhelmingly indicated the rape occurred at the same time as the murder. Further, introducing evidence of an allegation that McKinney orally sodomized a young boy more than a decade prior would serve to confuse the issues and otherwise distract the fact-finder from the central issues of the trial. <u>See</u> <u>Holmes</u>, 547 U.S. at 326.

After a review of the record and Petitioner's arguments on habeas, the Court concludes Petitioner's tenth claim is without merit.

### 11.    Ground Eleven:  Photographic Evidence

Petitioner argues in his eleventh ground for relief that admission of certain photographic evidence deprived him of due process and a fundamentally fair sentencing determination. (Pet. at 98-103.) Specifically, Petitioner challenges photographs of the Victim's anal injuries in State's Exhibits 7, 8, 9, 11, 12, 13, and 59. Petitioner argues the photographs are cumulative, inflammatory, and in the case of State's Exhibit 11, irrelevant.[14] Petitioner challenged the admission of the photographs on direct appeal and the OCCA denied relief. <u>Warner</u>, 2006 OK CR 40, ¶¶ 167-74, 144 P.3d at 886-88. Respondent submits

---

[14] Petitioner also argues that the prosecutor's comments on the graphic nature of the photographs amplified the prejudicial impact of the evidence and also deprived him of a fundamentally fair sentencing proceeding. (Pet. at 102-03.) This claim is discussed <u>infra</u>, in the context of Petitioner's claim of prosecutorial misconduct.

the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.  (Resp. at 87-91).

During the first stage of trial, the State introduced photographs of injuries to the Victim's anal region.  Robin Justice, the emergency room nurse who first noticed Victim's injuries, authenticated State's Exhibit 59.  (Tr., Vol. III, pp. 583-84.)  State's Exhibit 59 is an enlarged reproduction of a Polaroid photograph taken at the hospital in which Victim's genital region is visible.  The State introduced State's Exhibit 12 through the testimony of Officer Loftis, a technical investigator with the Oklahoma City Police Department.  (Id. at 652-53.)  Officer Loftis testified that Exhibit 12 was a photograph of Victim's injuries in which he observed some type of lubricant near the anus.  (Id. at 653-54.)  Dr. Ann Morie Spencer relied upon Exhibit 13 to describe the tears to Victim's rectum.[15]  She also concluded that the injury was consistent with some firm object being placed in the area with a considerable amount of force.  (Tr., Vol. IV, pp. 819-20; Court's Exhibit. 2, pp. 505-06.)  The State introduced Exhibits 7, 8, 9, and 11 through the testimony of Dr. Chai Choi, a State medical examiner.  (Tr., Vol. IV, pp. 925-27.)  These exhibits were photographs of different angles of Victim.  Exhibit 11 is a photograph of Victim's right leg with a emphasis on a single mark on her leg.  Dr. Choi did not rely upon State's Exhibits 8 or 11 in her testimony.

Habeas review does not entail correcting state evidentiary errors; instead, the Court's review is limited to violations of federal constitutional rights.  McGuire, 502 U.S. at 67-68.

---

[15]  The parties agreed Dr. Spencer was unavailable and her testimony from an earlier proceeding was read into the record.  (Tr., Vol. IV, pp. 818-20.)

When a petitioner challenges the admission of photographic evidence, the relevant inquiry on federal habeas review is "whether the admission of the photographs rendered the proceedings fundamentally unfair." Smallwood, 191 F.3d at 1275. See also Willingham v. Mullin, 296 F.3d 917, 928 (10th Cir. 2002) ("[A]n evidentiary objection is cognizable on habeas only if the alleged error was 'so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process.'") (quoting Fox v. Ward, 200 F.3d 1286, 1296 (10th Cir. 2000)).

On direct appeal, the OCCA concluded that despite some duplication in areas of Victim's body depicted in the photographs, Petitioner failed to demonstrate the exhibits were needlessly repetitive or inflammatory. Warner, 2006 OK CR 40, ¶ 168, 144 P.3d at 887. Even though some exhibits were "rather graphic," the OCCA reasoned that "the State is not required to downplay the visual effects of a particular crime." Id. The state court similarly found no error in the enlarged photograph submitted as Exhibit 59 because Ms. Justice testified that the photograph was an enlarged copy of which the jury was clearly aware. Id. ¶ 169, 144 P.3d at 887. In sum, the OCCA concluded the probative value of the exhibits was not outweighed by any prejudicial impact. Id. ¶ 170, 144 P.3d at 887.

After review of the contested evidence, the Court concludes the photographs did not fatally infect Petitioner's trial such that he was denied due process of law. The exhibits depicted the injuries to Victim and were relevant to the State's case. In addition, the photographs were not unnecessarily repetitive or gruesome in nature. To be sure, the exhibits depict terrible injuries to the genital region of an eleven-month old child. However, the

Court cannot conclude the OCCA's determination is contrary to, or an unreasonable application of, clearly established federal law. Petitioner's eleventh ground for relief is denied.

## 12. Ground Twelve: Prosecutorial Misconduct

In his twelfth ground for relief, Petitioner alleges prosecutorial misconduct throughout both stages of his trial deprived him of his right to a fair trial and reliable sentencing proceeding guaranteed by the Sixth, Eighth, and Fourteenth Amendments. (Pet. at 103-13.) Petitioner presented each alleged instance of prosecutorial misconduct on direct appeal and the OCCA denied relief on the merits. Warner, 2006 OK CR 40, ¶¶ 175-97, 144 P.3d at 888-91. Respondent argues the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law. (Resp. at 92-101.)

Claims of prosecutorial misconduct require the Court to determine whether the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). The prosecutor's statements "must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985). "When specific guarantees of the Bill of Rights are involved, [the Supreme Court] has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them." Donnelly, 416 U.S. at 643. The Tenth Circuit has held:

> [There is] an important distinction between an ordinary claim of prosecutorial misconduct, which warrants habeas relief only when the entire proceeding is rendered fundamentally unfair, and a claim that the misconduct effectively

deprived the defendant of a specific constitutional right, which may be the basis for habeas relief without proof that the entire proceeding was unfair.

Paxton v. Ward, 199 F.3d 1197, 1217 (10th Cir. 1999). See also Torres v. Mullin, 317 F.3d 1145, 1158-59 (10th Cir. 2003).

Petitioner argues fifteen instances of prosecutorial misconduct. The Court addresses them in turn, beginning with those from the first stage of Petitioner's trial.

### a.    Comments on the Photographic Exhibits

Petitioner argues the prosecutor, in first stage closing argument, improperly repeated his apology for showing the State's photographic exhibits of Victim's injuries. When the prosecutor published State's Exhibit 59 to the jury, he commented, "Apologize for the graphic nature." (Tr., Vol. III, p. 585.) The trial court sustained Petitioner's objection, admonished the jury to disregard the comment, and told the prosecutor to save any apologetic comments for closing arguments. (Id. at 585-86.) Later, the prosecutor asked Dr. Choi, "I've got here a photograph, State's Exhibit Number 13, that shows the rectal area of [Victim] and I know the jury has seen this photograph enough." (Tr., Vol. IV, p. 935.) The trial court again sustained Petitioner's objection and admonished the jury. (Id.) During first stage closing arguments, the prosecutor apologized to the jury for discussing the photographic exhibits, stating, "There's no comfortable, easy way to do this, but we do have a hard job to do." (Tr., Vol. VI, p. 1230.) The trial court overruled Petitioner's objection to the prosecutor's comment. On direct appeal, the OCCA determined the prosecutor's comments related to properly admitted evidence and that the comments did not unduly emphasize the

graphic nature of the photographs.  Warner, 2006 OK CR 40, ¶ 173, 144 P.3d at 888.  This conclusion is reasonable.  The comments related to properly admitted evidence and did not render Petitioner's trial fundamentally unfair.

### b. Comments on the Mental State of Victim

During first stage closing argument and in arguing the death resulted from the willful or malicious injuring, torturing, maiming or using of unreasonable force, the prosecutor commented, "Can there be any doubt of the pain [Victim] felt that day or mental cruelty?  And I can't get inside an eleven-month-old head, but I'll bet she was wondering where her mama was that day."  (Tr., Vol. VI, pp. 1148-49.)  Defense counsel objected and the trial court admonished the jury to disregard the prosecutor's comment.  (Id. at 1149-50.)  The OCCA held that any error was cured by the admonishment.  Warner, 2006 OK CR 40, ¶ 178, 144 P.3d at 888.  This conclusion is a reasonable determination.  Wilson, 536 F.3d at 1119 ("Even if the prosecutor's comments were improper, however, the trial court's admonition to the jury cured any error.").

### c. Prosecutor's comments on Petitioner's Right to Remain Silent

During closing argument, the prosecutor discussed Petitioner's statement given to police on the day of the homicide.  (Tr., Vol. VI, pp. 1166-67.)  Defense counsel objected, arguing the statement impermissibly commented on Petitioner's right to remain silent.  (Id. at 1167-68.)  The trial court overruled the objection and the OCCA concluded that Petitioner had waived his rights and voluntarily spoken with police, and as a result, the prosecutor was

permitted to comment on any of Petitioner's statements or refusals to answer. Warner, 2006 OK CR 40, ¶ 179, 144 P.3d at 888. On habeas, Petitioner argues the determination is an unreasonable application of federal law because Petitioner claims he did not waive his Miranda rights. See Doyle v. Ohio, 426 U.S. 610, 619 (1976) ("[T]he use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment."). However, Petitioner did not challenge the validity of his Miranda waiver as it relates to the statements given to law enforcement on the night of the homicide. A review of the record confirms his waiver was valid, and as a result, the prosecutor's comment did not violate Doyle, 426 U.S. at 619. This claim is without merit.

### d.       Prosecutor's Appeal to Emotion

At the very beginning of the prosecutor's first stage rebuttal closing argument, he stated:

> Ladies and gentlemen of the jury, when you try these kinds of cases, they're always tough on all the participants emotionally. There's no way that – as jurors, you know how tough it is – but there never comes a time in your life, if you care about children and you care about justice, that going through pictures like we have in this case, going through evidence that involves a young baby, there never comes a time when you get to a point where you look at pictures where the worst has happened to a young baby and it doesn't hit you emotionally. If you get to that point, then you need to stay out of this kind of business.

(Tr., Vol. VI, pp. 1211-12). The trial court sustained defense counsel's objection to the prosecutor's comment on "stay[ing] out of this kind of business," but did not admonish the jury to disregard the comment. (Id. at 1212.) The OCCA concluded that any error was cured

by the trial court sustaining Petitioner's objection and the jury instructions that required the jury to base their verdict on the law and evidence. Warner, 2006 OK CR 40, ¶ 181, 144 P.3d at 889. Petitioner fails to demonstrate that the OCCA's determination is an unreasonable application of clearly established federal law.

### e. Comments on Defense Counsel's Arguments

In first stage closing argument, defense counsel objected to the prosecutor's labeling of defense counsel's arguments "trivial pursuit games." (Tr., Vol. VI, p. 1219.) The OCCA determined the comments did not cast aspersions on defense counsel, but rather were responses to argument made by the defense. Warner, 2006 OK CR 40, ¶ 182, 144 P.3d at 889. The OCCA's determination is not unreasonable. Defense counsel argued Ms. Waller's statements were inconsistent (Tr., Vol. VI, pp. 1205-08), and the prosecutor's comments were an attempt to argue the relative importance of different pieces of evidence. As a result, there is no error.

### f. Misstatement of Evidence

Defense counsel objected to the prosecutor's statement, "On the defendant's taped statement, there's no claim, nothing he points to in there about her coming home blowing and going and fussing and being angry at anybody. It's completely absent from the evidence, unlike what we know about this defendant, Mr. Warner." (Tr., Vol. VI, p. 1225.) The trial court responded, "The jury heard the evidence." (Id. at 1226.) The OCCA concluded any misstatement of the evidence was minor:

> The record shows Shonda Waller testified she was mad when she arrived home from the grocery store because she had missed part of her soap opera. However, when the prosecutor's comment is read in context he is trying to make the point there was no evidence Shonda Waller was "hot and mad" and came home "blowing and going and fussing and being angry at anybody" and angry to the extent that she could have violently shaken the victim and caused her death.

Warner, 2006 OK CR 40, ¶ 183, 144 P.3d at 889. The OCCA's determination that the prosecutor's comment was not a misstatement of the evidence is reasonable after considering the statement in its context. In addition, the jury was instructed that evidence "is the testimony received from the witnesses under oath, stipulations made by the attorneys, and the exhibits admitted into evidence during the trial." (VI O.R. at 1089.) Cf. Thornburg v. Mullin, 422 F.3d 1113, 1134 (10th Cir. 2005) (holding that the impact of a prosecutor's misstatements can be minimized with an instruction that the jury "should consider only the evidence introduced at trial, that the attorneys' statements and arguments are not evidence"). The OCCA's determination is not an unreasonable application of clearly established federal law.

### g.      Bolstering Credibility of Witnesses

Petitioner again asserts the prosecutor improperly bolstered the credibility of Petitioner's son CW and Det. Edwards during first stage closing argument. (Tr., Vol. VI, pp. 1226-28.) The OCCA determined the comments were permissible in light of the evidence presented. Warner, 2006 OK CR 40, ¶ 184, 144 P.3d at 889. As this Court has previously concluded, the OCCA's admission of the underlying evidence is not contrary to, nor an

unreasonable application of, clearly established federal law, see supra III.C.3, the prosecutor's argument summarizing that evidence is similarly not unreasonable.

### h. Summarizing Statements Petitioner Made to Det. Mullenix

Petitioner argues the prosecutor relied upon the improper comments or opinions of Det. Mullenix from his interview with Petitioner on the night of the homicide. (Tr., Vol. VI, p. 1245.) The OCCA determined the trial court properly overruled Petitioner's objection because the prosecutor was simply describing what took place during the interview with Det. Mullenix. Warner, 2006 OK CR 40, ¶ 185, 144 P.3d at 889. In addition, the jury viewed the videotaped interview between Petitioner and Det. Mullenix and was therefore capable of reviewing the evidence on its own. Id. Given that the prosecutor's statements accurately depicted properly admitted evidence, Petitioner's claim is without merit.

### i. Prosecutor's Gestures During Closing Argument

Petitioner submits that the prosecutor engaged in improper pointing and gesturing during closing argument. (Pet. at 107.) The OCCA determined trial counsel failed to timely object and the record was insufficient to review the claim on appeal. Warner, 2006 OK CR 40, ¶ 186, 144 P.3d at 889-90. The record reflects Petitioner's trial counsel objected to the prosecutor pointing at Petitioner during his closing argument. (Tr., Vol. VI, p. 1256.) Trial counsel stated that the defense had objected throughout trial. (Id.) On habeas, Petitioner does not argue how the OCCA's determination is an unreasonable application of clearly established law, or how its factual determination is unreasonable in light of the evidence

presented during state court proceedings. 28 U.S.C. § 2254 (d)(1)-(2). Accordingly, relief here is not available.

To the extent Petitioner argues relief based upon ineffective assistance of counsel (Pet. at 104), he has failed to demonstrate the OCCA's rejection of a claim of ineffective assistance of counsel is contrary to, or an unreasonable application of clearly established federal law. Warner, 2006 OK CR 40, ¶ 206, 144 P.3d at 893.

### j. Statements that Justice Requires a Death Sentence

During second stage opening and closing argument, the prosecutor made various comments which Petitioner claims were improper statements that justice requires a death sentence. (Pet. at 108-09.) It is error for a prosecutor to direct a jury to return a death sentence "on the grounds of civic duty." Le v. Mullin, 311 F.3d 1002, 1022 (10th Cir. 2002). See also Malicoat, 426 F.3d at 1256; Thornburg, 422 F.3d at 1134. Petitioner references six instances of alleged improper prosecutorial comment for this Court's review. The following four comments were not met with an objection:

> Ladies and Gentlemen of the jury, I'm confident that after you hear the additional evidence, the aggravating circumstances for the State of Oklahoma, that you'll see that there is one right, deserved, and proper punishment in this case.

(Tr., Vol. VII, p. 1268).

> I submit to you that the only appropriate punishment in this case for the defendant's acts is death.

(Tr., Vol. VIII, p. 1489).

> I submit to you that the only fair, just, and appropriate punishment for this defendant for the acts he committed on [Victim] on August 22nd of '97 is the death sentence.

(Tr., Vol. VIII, 1509).

> I'd ask you to look within your hearts and your minds and you'll see that there is that one right and proper punishment for Charles Fredrick Warner and I'd ask you to return a verdict for the death penalty.

(Tr., Vol. VIII, p. 1547-48).

Petitioner objected to the two following comments made by the prosecutor. The trial court sustained Petitioner's objection to the first comment and admonished the jury to disregard it. (Tr., Vol. VIII, pp. 1545-47.) Petitioner's objection to the second comment was overruled. (Id. at 1547.) The two comments are reproduced here:

> In placing a value on the life of [Victim] so that you can correlate the punishment, the punishment that matches and fits what it is[,] what he took from all of us[,] and what he took from that baby, how does any punishment other than the death penalty do honor to her memory?
>
> . . . .
>
> [T]ry and imagine this is a case that doesn't demand the death penalty for a crime for one person to choose to do on another, a series of acts. If this doesn't do it, then what crime possibly could?

(Tr., Vol. VIII, pp. 1545-47).

The OCCA denied relief, concluding:

> In each instance, the prosecutor's comment about the appropriateness of the death sentence was preceded by a summary of the evidence in aggravation. The comments did not suggest that the jury's only moral course was to impose the death penalty. The comments were well within the permissible bounds of closing argument and not personal opinions as to the appropriate sentence.

<u>Warner</u>, 2006 OK CR 40, ¶ 189, 144 P.3d at 890. This determination is reasonable. The first four comments were arguments for the imposition of death without an improper appeal to moral or civic duty. Any impropriety in the prosecutor's argument to "honor the memory" of Victim was cured by the trial court's admonishment to the jury. The final complained-of comment was an argument that the death penalty is entirely appropriate in cases such as Petitioner's. This comment did not improperly convey that the jury had a civic or moral duty to impose death. In sum, the prosecutor's statements did not deprive Petitioner of a fundamentally fair trial in violation of due process.

### k. Improper Appeals to Emotion and Sympathy

Petitioner highlights comments made by the prosecutor during second stage closing argument as improper appeals to emotion and sympathy. The prosecutor commented on the amount of pain Victim suffered, what was taken from Shonda Waller, and the experiences Victim would not be able to experience as a result of the homicide. (Tr., Vol. VIII, pp. 1494-95, 1526, 1543-44.) The OCCA concluded that "the comments in this case, those met with a timely objection and those that were not, fell within the prosecutor's wide range of permissible argument" because they were "based on the evidence and were reasonable inferences that could be drawn from the death of an eleven month old infant." <u>Warner</u>, 2006 OK CR 40, ¶ 190, 144 P.3d at 890.

The decision to impose death must be "based on reason rather than caprice or emotion." <u>Gardner v. Florida</u>, 430 U.S. 349, 358 (1977). The Court's review of the record does not support the conclusion that the prosecutor's statements rendered Petitioner's trial

fundamentally unfair.  The prosecutor's comments were "reasonable possible inferences based on the evidence."  Moore v. Gibson, 195 F.3d 1152, 1172 (10th Cir. 1999).  "'Some emotion is inevitable in capital sentencing.'"  Id. (quoting Coleman v. Brown, 802 F.2d 1227, 1239 (10th Cir. 1986)).  To the extent the prosecutor's comments bordered on impropriety, in light of the evidence presented in second stage, Petitioner's sentencing proceeding was not rendered fundamentally unfair.

### l.    Denigration of Mitigating Evidence

Petitioner submits the prosecutor improperly denigrated Petitioner's evidence in mitigation when he said, "How could anything, anything this defendant has done in his past reduce the moral culpability of raping and beating to death an eleven-month-year-old [sic] baby?  How can anything he's done in his past reduce his culpability for that act?"  (Tr., Vol. VIII, p. 1499.)  The prosecutor also argued that if the jury multiplied Petitioner's mitigation evidence by a factor of ten, the evidence in aggravation would still outweigh the evidence in mitigation.  (Id. at 1535-36.)  Petitioner presented this argument on direct appeal and the OCCA denied relief:

> Of the two comments challenged by [Petitioner], only the second comment was met with an objection and the objection was overruled.  (Tr. Vol. VIII, pg. 1535).  Reviewing the first comment for plain error only, we find none.  The prosecutor has the right to discuss evidence during the second stage in arguing for an appropriate punishment.  Bland, 2000 OK CR 11, ¶ 94, 4 P.3d at 727; Mayes v. State, 1994 OK CR 44, ¶ 164, 887 P.2d 1288, 1322, cert. denied, 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995).  The prosecutor may properly attempt to minimize the effect of the evidence presented by the defense.  Short, 1999 OK CR 15, ¶ 77, 980 P.2d at 1105.  Further, the jury was appropriately instructed as to the mitigating evidence and

was not in any way precluded from considering any and all mitigating evidence. Accordingly, we find no error.

Warner, 2006 OK CR 40, ¶ 192, 144 P.3d at 890-91. Petitioner has not demonstrated that the OCCA's determination is contrary to, or an unreasonable application of, clearly established federal law.

### m. Argument That Petitioner Caused VW's Premature Birth

Petitioner's claim of prosecutorial misconduct as it relates to the prosecutor's comments on the premature birth of VW is discussed in the context of Petitioner's claim of ineffective assistance of counsel. For the reasons detailed infra in Section III.C.15.b, Petitioner's claim is denied.

### n. Request for Jury to Show Same Sympathy Petitioner "Showed to Victim"

Petitioner objected to the prosecutor's closing argument in which he asked the jury to "show this defendant the same mercy that he showed to [Victim] that day as she is screaming out." (Tr., Vol. VIII, p. 1508.) The trial court overruled Petitioner's objection. (Id.) The OCCA interpreted the comment as requesting sympathy for Victim, and even though it would not condone the statement, the OCCA did not consider the comments "so grossly improper to warrant reversal or modification." Warner, 2006 OK CR 40, ¶ 194, 144 P.3d at 891.

"Arguments that improperly encourage the jury to impose a sentence of death based on considerations of sympathy for the victims may constitute due process error." Le v. Mullin, 311 F.3d at 1015. The Court is not persuaded the comments deprived Petitioner of

a fundamentally fair trial. Taken in context, the State produced substantial evidence in aggravation. E.g. Bland v. Sirmons, 459 F.3d 999, 1027-28 (10th Cir. 2006) (holding that prosecutor's improper comments did not afford habeas relief where comments did not deprive petitioner of a fundamentally fair trial). The OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.

### o.   Comment on Petitioner's Lack of Remorse

In the context of discussing Petitioner's videotaped statement to police, the prosecutor argued Petitioner demonstrated a lack of remorse. (Tr., Vol. VIII, p. 1541.) On direct appeal, the OCCA concluded the prosecutor's statements were not error because lack of remorse is relevant to a finding that a defendant is a continuing threat to society. Warner, 2006 OK CR 40, ¶ 196, 144 P.3d at 891. Under Oklahoma law, lack of remorse is one factor that can be considered in support of the continuing threat to society aggravating circumstance. Cudjo v. State, 1996 OK CR 43, ¶ 30, 925 P.2d 895, 902. Petitioner argues it is improper to comment on a lack of remorse when he has maintained his innocence. (Pet. at 111.) However, Petitioner does not cite any clearly established federal law to support his claim that "lack of remorse" evidence is inadmissible during the sentencing stage of a capital trial where the defendant has maintained his innocence. Rather, Petitioner, relies on Zant v. Stephens, 462 U.S. 862, 885 (1983), to argue that it is unlawful to permit a jury to draw an adverse inference from constitutionally protected conduct. (Pet. at 112.)

Zant does not apply to Petitioner's case. In Zant, the Supreme Court held that a death sentence supported by multiple aggravating circumstances need not always be set aside if one

aggravator is found to be invalid. <u>Zant</u>, 462 U.S. at 886-88. In arriving at its holding, the Court explained that due process prohibits a jury from drawing "adverse inferences from conduct that is constitutionally protected." <u>Id.</u> at 885. Not only does <u>Zant</u> fail to directly support Petitioner's claim, cases from the Tenth Circuit acknowledge the use of "lack of remorse" evidence in aggravation. <u>See, e.g.</u>, <u>Gilbert v. Mullin</u>, 302 F.3d 1166, 1182 (10th Cir. 2002); <u>James v. Gibson</u>, 211 F.3d 543, 559 (10th Cir. 2000). In sum, the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.

### p.     Cumulative Prosecutorial Misconduct

The OCCA reviewed Petitioner's claim of cumulative prosecutorial misconduct and concluded, "[W]hile some comments may have tested the bounds of propriety, we find none of the comments deprived [Petitioner] of a fair trial, or had any prejudicial impact on the judgment and sentence." <u>Warner</u>, 2006 OK CR 40, ¶ 197, 144 P.3d at 891. After consideration of Petitioner's arguments on habeas and review of the state court record, the Court concludes the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.

### 13.     Ground Thirteen:  Challenges to Aggravating Circumstances

In his thirteenth claim for relief, Petitioner challenges his sentence of death, arguing error in the jury's finding of both aggravating circumstances. (Pet. at 114-23.) In particular, Petitioner argues the use of unadjudicated acts, including the uncharged attempted vaginal rape of Victim, in support of the continuing threat aggravating circumstance deprived

Petitioner of due process of law. In addition, Petitioner raises a sufficiency of the evidence and a jury instruction challenge in relation to the especially heinous, atrocious, or cruel aggravating circumstance. Petitioner raised the claims on direct appeal and the OCCA denied relief on the merits. Warner, 2006 OK CR 40, ¶¶ 117-36, 144 P.3d at 877-81. Respondent argues the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law. (Resp. at 102-08.)

### a.    Continuing Threat Aggravating Factor

In support of the continuing threat aggravating factor, the State relied upon evidence that Petitioner attempted to vaginally rape Victim. (Tr., Vol. IV, p. 931; Vol. VI, pp. 1152-53; Vol. VIII, p. 1494.) Petitioner claims the State's reliance on an uncharged attempted rape was fundamentally unfair and violated his right to due process based on insufficient notice. (Pet. at 116.) In its Second Amended Bill of Particulars, the State alleged, "[Victim] had petechiae around the urethral opening and a tear inside the rectal opening, both consistent with blunt object penetration of them." (I O.R. at 26.) The OCCA denied relief on Petitioner's insufficient notice claim, concluding:

> While the notice need not contain every detail, "it must contain the essential point(s), statement(s), or fact(s) and the main element(s) of the evidence the State intends to introduce to prove the aggravating circumstances alleged so the accused can prepare and present a defense or explanation." Littlejohn v. State, 2004 OK CR 6, ¶ 16, 85 P.3d 287, 295, cert. denied, 543 U.S. 947, 125 S.Ct. 358, 160 L.Ed.2d 261 (2004). Although brief, this language was sufficient to put [Petitioner] on notice that the State would present evidence of the attempted vaginal rape. See Williams, 2001 OK CR 9, ¶ 52, 22 P.3d at 717; Miller v. State, 1998 OK CR 59, ¶ 65, 977 P.2d 1099, 1112, cert. denied, 528 U.S. 897, 120 S.Ct. 228, 145 L.Ed.2d 192 (1999). Further, this was

[Petitioner's] third trial. By this time in the proceedings, [Petitioner] was well aware of the evidence to be used in support of the aggravators.

Warner, 2006 OK CR 40, ¶ 124, 144 P.3d at 879. Petitioner fails to demonstrate how the OCCA's determination that he was not deprived of due process is contrary to, or an unreasonable application of, clearly established federal law.

In addition, Petitioner challenges the use of unadjudicated acts in support of the continuing threat aggravating circumstance, claiming the use of such unreliable evidence violates his right to due process, to confront and rebut the evidence against him, and to a reliable sentencing determination. Petitioner presented this argument to the OCCA, and the state court declined to reconsider its prior decisions upholding the aggravator. (Appellant's Brief on Direct Appeal, pp. 72-74); Warner, 2006 OK CR 40, ¶ 125, 144 P.3d at 879.

Petitioner's argument is foreclosed by direct and binding Tenth Circuit precedent which holds that use of unadjudicated acts during second stage proceedings is permissible. See, e.g., Boltz v. Mullin, 415 F.3d 1215, 1231 (10th Cir. 2005) ("[T]his Court has flatly held that 'the admission of evidence of unadjudicated offenses at a sentencing proceeding does not violate due process.'") (quoting Hatch v. State, 53 F.3d 1447, 1465 (10th Cir. 1995)); Smith v. Gibson, 197 F.3d 454, 460 (10th Cir. 1999) ("[A]dmission of unadjudicated bad acts during a capital sentencing proceeding does not violate due process."). Accordingly, the Court finds that Petitioner has failed to demonstrate the OCCA's determination is contrary to, or an unreasonable application of, clearly established federal law. (Resp. 104-05.)

Petitioner also appears to argue that, in general, the OCCA upholds death sentences for those cases involving a history of domestic abuse by relying on other, more compelling evidence. (Pet. at 118-19.) Whether or not that is the case, Petitioner makes no attempt to demonstrate how prior holdings of the OCCA render its current decision contrary to, or an unreasonable application of, clearly established federal law.

### b.     Especially Heinous, Atrocious, or Cruel

With respect to the especially heinous, atrocious, or cruel aggravating factor, Petitioner argues there was insufficient evidence to support a finding of conscious suffering. Further, Petitioner asserts the jury instructions failed to include the word "physical" in its description of serious abuse and that this error further undermined the validity of the heinous, atrocious, or cruel aggravating factor. (Pet. at 119-23.)

In a sufficiency of the evidence challenge, the Court looks to Oklahoma law to determine the substantive requirements of the element in question. Jackson, 443 U.S. at 325 n.16. The "especially heinous, atrocious, or cruel" aggravating factor requires evidence of "conscious serious physical abuse or torture prior to death." Le v. State, 1997 OK CR 55, ¶ 35, 947 P.2d 535, 550; see also Black v. State, 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074. A review of the record confirms the OCCA's determination is not (1) contrary to, or an unreasonable application of, clearly established federal law; or (2) an unreasonable determination of the facts in light of the evidence presented. First, the OCCA applied the correct legal standard. See Warner, 2006 OK CR 40, ¶ 133, 144 P.3d at 881 ("Reviewing the evidence in the light most favorable to the State, the evidence is sufficient to support the

jury's finding that the victim consciously suffered pain from the anal rape and violent shaking at [Petitioner's] hands prior to her death.").

Petitioner's argument focuses on the evidence supporting a finding that Victim endured physical suffering before she lost consciousness. He cites to the medical examiner's inability to determine the order in which Victim's three broken ribs, lacerated liver, spleen and lung bruising, and skull fractures were inflicted. Petitioner also relies upon the state medical examiner's testimony that Victim's head injury likely rendered her unconscious and that the State did not present any evidence that Victim cried out in pain. (Pet. at 120-22.) The OCCA's opinion summarizes the relevant evidence:

> The medical evidence concerning when the victim would have lost consciousness was conflicting. Dr. Choi testified the autopsy revealed a violent shaking and crushing-type force caused the victim's injuries. On cross-examination, she said she could not determine which injury, to the victim's head, chest, liver or abdomen, happened first. She said the head injury would not result in the immediate loss of consciousness. She stated her overall impression was that the victim was injured then she rapidly lost consciousness. Dr. Choi said she could not put an exact time frame on the occurrence of the events. On cross-examination, Dr. Choi admitted that at [Petitioner's] previous trial, she testified that it was more likely that the victim lost consciousness at the same time the injuries were received.

> Dr. Spencer testified that in reviewing photos of the victim's injuries, the injuries were consistent with shaken baby syndrome. She said the injuries to the victim's anal area were consistent with a firm object being violently placed there. She did not give an opinion as to whether the victim lost consciousness. [CW] testified he saw [Petitioner] shake the victim the day she died. Scared of [Petitioner], [CW] said he then hid in his sister's room. Additionally, in [Petitioner's] interview with Officer Ballard, [Petitioner] said while Shonda was at the store, he was in the bedroom with the victim and [DW]. He said he left the room only to return to find the victim lying on the floor crying. Defense witness Phillip Nowicki, a professor of pediatrics at Ohio State University, testified that after reviewing the victim's medical

records, he believed she would have lost consciousness immediately upon sustaining the head injury.

<u>Warner</u>, 2006 OK CR 40, ¶¶ 131-32, 144 P.3d at 880-81.

The Court concludes the OCCA's determination is not unreasonable. Remembering that review of sufficiency of the evidence claims is "sharply limited," <u>Wilson</u>, 536 F.3d at 1105, the facts in the record permit a reasonable factfinder to conclude Victim endured conscious physical suffering during the homicide. <u>See id.</u> ("[W]hen there are conflicting facts in the record that permit disparate inferences, the Court 'must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'") (<u>quoting</u> <u>Turrentine v. Mullin</u>, 390 F.3d 1181, 1197 (10th Cir. 2004)). Even though there was no evidence on the exact sequence of injuries inflicted upon Victim, a reasonable fact finder could conclude that the sequence included injuries causing physical suffering before Victim was rendered unconscious.

Petitioner also argues the failure to include the word "physical" in the jury instruction, renders the instruction constitutionally defective.[16] (Pet. at 120-21.) Petitioner's jury was instructed as follows:

---

[16] Petitioner also argues, for the first time on habeas, that the jury instruction failed to include the element of "consciousness." (Pet. at 122-23.) The failure of Petitioner to raise this claim in state court deprives this Court of the ability to address his argument. 28 U.S.C. § 2254(b)(1)(A). Moreover, because the Tenth Circuit has denied this very claim based on harmless error, <u>see</u> <u>Wilson</u>, 536 F.3d at 1108, Petitioner's claim can be denied, notwithstanding his failure to exhaust his claim in state court. 28 U.S.C. § 2254(b)(2).

As used in these instructions, the term "heinous" means extremely wicked or shockingly evil; "atrocious" means outrageously wicked and vile; "cruel" means pitiless, or designed to inflict a high degree of pain, utter indifference to, or enjoyment of, the sufferings of others.

The phrase "especially heinous, atrocious, or cruel" is directed to those crimes where the death of the victim was preceded by torture of the victim or serious abuse.

(VI O.R. at 1070). The OCCA acknowledged that the failure to include the word "physical" in the instruction, which would change the jury instruction to read "serious physical abuse," was harmless error. Warner, 2006 OK CR 40, ¶¶ 134-35, 144 P.3d at 881. The OCCA determined, "[W]e are not persuaded 'that the error dramatically lessened, or indeed lessened at all the standard of proof which the jury had to apply to find this aggravator.'" Id. ¶ 135, 144 P.3d at 881 (quoting Johnson v. State, 1996 OK CR 36, ¶ 42, 928 P.2d 309, 318, overruled on other grounds by Williams v. State, 2008 OK CR 19, 188 P.3d 208).

Because the OCCA found the omission of "physical" from the jury instruction was error, the Court applies the Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), harmless error standard to determine whether habeas relief is warranted. Under Brecht, the test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" Id. (quoting Kotteakos v. United States, 328 U.S. 750 (1946)). If "grave doubt" exists about the harmlessness of the error, the Court must treat the error as though it had affected the verdict. See O'Neal v. McAninch, 513 U.S. 432, 435 (1995). "Grave doubt" exists where the issue of harmlessness is "'so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error.'" Bland, 459 F.3d at 1009-10 (quoting O'Neal, 513 U.S. at 435) (alteration in original).

The Court agrees with the state appellate court's conclusion. The omission of the word "physical" did not have a substantial and injurious effect on the verdict. It was clear from the evidence of Victim's injuries that the abuse presented was of a "physical" nature. In addition, the Tenth Circuit has previously determined that "despite the omission of the word 'physical,' from the instruction, the instruction still performed its required narrowing function and imposed restraint upon the sentencer." Miller v. Mullin, 354 F.3d 1288, 1300 (10th Cir. 2004). See also Turrentine v. Mullin, 390 F.3d 1181, 1196 (10th Cir. 2004). The Court concludes the omission of "physical" from the jury instruction did not have a substantial and injurious effect or influence in determining the jury's verdict. Accordingly, Petitioner's thirteenth ground for relief is denied.

### 14. Ground Fourteen: Victim Impact Testimony

In his fourteenth ground for relief, Petitioner argues Shonda Waller's statement, admitted pursuant to Oklahoma's statute permitting victim impact evidence, unduly emphasized and addressed only the emotional impact of Victim's death and that this evidence rendered his sentencing proceeding fundamentally unfair in violation of the Eighth and Fourteenth Amendments. During second stage, Shonda Waller read a prepared statement. The Court reproduces her statement here for context:

> I remember the day I brought her home. I had never known such happiness until I had [Victim], the way she looked at me and smiled. I dread not being loved, but my daughter changed all of that. She was my world and my heart and my soul. Never has any one person made me feel as wonderful as [Victim] did.

I can remember the times we spent together, her laying in my arms, falling asleep, the sweet smell of her little feet when she had been in her socks and shoes all day, the sweetness of her breath after she drank her milk. To be blessed with such a wonderful gift and then to have that all taken away in an instant is something I just can't bear.

There are times when I wake up thinking I hear her crying. I hear her calling out for her mommy, yet I can't seem to get to her. I wake up to make her bottles for a child that's no longer there. I constantly ask myself am I going crazy, can this just be a dream?

I think of death often, yet I have to remind myself that if I take my life, I will never get the chance to see her again at heaven's gates. I know we will cross one day. I look forward to holding my child who is only now a memory.

The only dreams I have are of the date of August 22nd, 1997, the last day I saw my child smile and the day I held her body in my arms for the last time, except this time there was no life to her, no more eyes to look into, just the pale, limp body of somebody who looked like my child, but couldn't possibly be.

. . . .

My baby wouldn't just lay there. Reality kicks in from time to time, but I still wish and pray that I could have my baby back. Now all I have are memories that are truly wonderful, but I miss her. [Victim], mommy misses her fat fat.

Never again will I be able to hold her, kiss her, tuck her in at night. Never again will I hear her call me mommy, except for in a dream. So now my life is just a dream, a dream of a child I once had. So I will go on dreaming as long as it keeps me close to her.

(Tr., Vol. VII, p. 1383-85). During Ms. Waller's statement, she began crying and had to compose herself to finish the statement. In his motion for a new trial, Petitioner alleged that several members of the jury also cried during Ms. Waller's statement. (VI O.R. at 1153.)

Petitioner argues the highly emotional nature of the victim impact testimony exceeded the scope of permissible victim impact evidence in 21 Okla. Stat. § 701.10 (C), 22 Okla Stat. § 984, and Cargle v. State, 1995 OK CR 77, 909 P.2d 806.[17] Petitioner also argues the evidence's probative value is substantially outweighed by its unfair prejudicial effect. 12 Okla. Stat. § 2403. However, review before this Court is limited to errors of federal law.

In Payne v. Tennessee, 501 U.S. 808 (1991), the Supreme Court held that the Eighth Amendment does not erect a per se bar to victim impact evidence relating to the victim and the impact on the victim's family. Id. at 827, 830 n.2. However, relief may be available via the Due Process Clause of the Fourteenth Amendment if the introduced evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." Id. at 825. The OCCA addressed Petitioner's claim:

> A substantial portion of Ms. Waller's victim impact testimony addressed the emotional and psychological toll the victim's murder caused in her life. However, this is understandable given that the victim was only eleven months old at the time of her death. The victim impact evidence in this case comes close to weighting the scales too far on the side of the prosecution by so intensely focusing on the emotional impact of the victim's death. However, taken as a whole, the testimony was within the bounds of admissible evidence set forth in Cargle and § 984. The focus on emotion did not have such a prejudicial effect or so skew the presentation as to divert the jury from its duty to reach a reasoned moral decision on whether to impose the death penalty. See DeRosa, 2004 OK CR 19, ¶¶ 78-79, 89 P.3d at 1151; Murphy, 2002 OK CR 24, ¶ 46, 47 P.3d 876, 885; Phillips, 1999 OK CR 38, ¶ 100, 989 P.2d at 1043. The most objectionable comments were deleted at defense counsel's request. Ms. Waller's testimony was brief, comprising approximately two pages of the trial transcript. While the transcript indicates that at one point,

---

[17] The Tenth Circuit granted habeas relief in Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003).

Ms. Waller cried during her testimony, she was able to compose herself and finish her testimony. Further, the jury was informed in their second stage instructions on the appropriate weight and consideration to be given victim impact evidence. See Cargle, 1995 OK CR 77, ¶ 77, 909 P.2d at 828-829. Under these circumstances, the jury was not prevented from fulfilling its function of making a reliable sentencing determination despite the emotional focus of the victim impact evidence.

Warner, 2006 OK CR 40, ¶ 152, 144 P.3d at 884.

The Court concludes the admission of Ms. Waller's statement did not deprive Petitioner of due process. To be sure, Ms. Waller's testimony included highly poignant content that would illicit an emotional response. However, this Court's inquiry requires an examination of Ms. Waller's statement in the context of the aggravating and mitigating factors. Short v. Sirmons, 472 F.3d 1177, 1193 (10th Cir. 2006). As previously discussed, the State's case in aggravation was strong. Petitioner was convicted of anally raping Victim and inflicting abusive injuries sufficient to cause her death. Petitioner had a history of domestic abuse, including abuse to his child with disabilities (Tr., Vol. VII, pp. 1277-84; 1300), and beating his pregnant wife (id. at 1316-17).

Petitioner's evidence in mitigation is aptly described in the OCCA's opinion:

[Petitioner] presented thirteen (13) witnesses in his behalf. These witnesses included his mother, father, brother, sister, and cousin. Additionally, the mother, aunt, and grandmother of his daughter [DW] testified as well as two people who described themselves as friends, two others who said they were neighbors and one who said he had rented a house to [Petitioner]. Essentially, these witnesses testified they loved and cared for [Petitioner] and his life had meaning and significance to them; he was a loving son and father and wanted to be the type of father that he did not have; he read books to his children and taught them the alphabet; he tried to teach his son to be responsible and helped him with his homework; he sought and was awarded custody by default of his children [CW] and [VW]; he worked with his handicapped daughter [VW],

taught her to walk and took her to medical appointments; he was not easily angered; he cared for his grandmother after her surgery; he had no prior felony convictions and had never been in trouble with the law except for traffic tickets; he does not use drugs or alcohol; his children were observed not to be scared of him; he would let his brother and sister eat first; he remembers family birthdays and holidays; and he was a good football player who encouraged and supported his younger brother to play football.

Additional mitigation evidence showed [Petitioner] was a loyal friend who gave a friend rides to work; he was a good neighbor and good tenant; he kept his house in good repair; he was trying to improve his life by making plans for school, a job, and had borrowed some motivational tapes; he was never seen to hit or abuse his children; he caught his daughter [DW] in the street before she was run over by a car; no criminal charges have ever been filed against him for any allegations made by Vonricca Warner; he took the victim to the emergency room to obtain medical attention; and he is capable of making a contribution to society. This evidence was summarized into twenty-two (22) factors and submitted to the jury for their consideration as mitigating evidence, as well as any other circumstances the jury might find existing or mitigating. ([VI] O.R. 1078-1081).

Warner, 2006 OK CR 40, ¶¶ 143-44, 144 P.3d at 882-83.

After considering the evidence in support of aggravation and mitigation, the Court cannot conclude that the singular victim impact statement of Ms. Waller, as emotional as it was, rendered Petitioner's sentencing proceeding fundamentally unfair in violation of due process. Accordingly, the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law.

Petitioner also submits the trial court improperly permitted the State to present the victim impact statement of Ms. Waller before it made a determination that there was sufficient evidence of one or more aggravating circumstances already in the record. See Cargle, 1995 OK CR 77, ¶ 76, 909 P.2d at 828 ("[V]ictim impact evidence should not be

admitted until the trial court determines evidence of one or more aggravating circumstances is already present in the record."). The record reflects that Petitioner moved to have the trial court determine whether there was sufficient evidence of aggravating factors immediately prior to Ms. Waller's second stage testimony. (Tr., Vol. VII, p. 1381.) The trial court did not rule on Petitioner's motion until the following day. It determined that the State presented sufficient evidence of both the especially heinous, atrocious, or cruel and the continuing threat aggravating circumstance. (Tr., Vol. VIII, pp. 1462-67). The OCCA concluded this procedure was in error, but did not result in reversible error pursuant to its earlier holding in Hooks v. State, 2001 OK CR 1, ¶ 35, 19 P.3d 294, 312-13, overruled in part by Easlick v. State, 2004 OK CR 21, 90 P.3d 556. Warner, 2006 OK CR 40, ¶ 154, 144 P.3d at 885. Petitioner neglects to argue how this determination is contrary to, or an unreasonable application of, clearly established federal law.

Petitioner's fourteenth ground for relief is denied.

### 15. Ground Fifteen: Ineffective Assistance of Counsel

Petitioner asserts that he was denied effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments. Specifically, Petitioner argues two instances in which his counsel was constitutionally ineffective. First, Petitioner complains his trial counsel was ineffective for failing to use medical records to rebut the prosecution's assertion that Petitioner's domestic abuse of his former wife caused the premature birth and resulting medical complications of his daughter, VW. (Pet. at 133-35.) Second, Petitioner argues his appellate counsel was ineffective for failing to argue that double jeopardy barred his

subsequent prosecution after the trial court granted his motion for a mistrial. (Id. at 135-42.) Respondent argues Petitioner has failed to demonstrate either a violation of his constitutional rights or that the OCCA's determination denying relief is contrary to, or an unreasonable application of, clearly established federal law. (Resp. at 116-26.)

### a. Legal Standards for Claims of Ineffective Assistance of Counsel

"'The right to counsel is the right to the effective assistance of counsel.'" Strickland v. Washington, 466 U.S. 668, 686 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. Under Strickland, a party asserting ineffective assistance of counsel must show that (1) counsel's performance was deficient and (2) that the deficient performance prejudiced him. Id. at 687. Because Petitioner must establish both Strickland prongs, a reviewing court need not analyze both deficient performance and prejudice. Id. at 697.

To establish deficient performance, Petitioner must demonstrate "that counsel's representation fell below an objective standard of reasonableness." Id. at 688. Reasonableness of performance is judged against "prevailing professional norms." Id. This determination is "highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. Petitioner "must overcome the presumption that, under the circumstances, the

challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Counsel's performance "'must have been completely unreasonable, not merely wrong.'" Hooks v. Workman, 606 F.3d 715, 723 (10th Cir. 2010) (quoting Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999)).

In addition, Petitioner must affirmatively prove that the deficient performance was prejudicial to his defense. Strickland, 466 U.S. at 693. Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Establishing a reasonable probability of a different outcome requires something less than a showing 'counsel's deficient conduct more likely than not altered the outcome in the case.' Instead, a reasonable probability is one 'sufficient to undermine confidence in the outcome.'" Hooks, 606 F.3d at 724 (quoting Strickland, 466 U.S. at 693, 694).

Under 28 U.S.C. § 2254, a claim of ineffective assistance of counsel is a mixed question of law and fact. Strickland, 466 U.S. at 698. On habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, ___, 129 S. Ct. 1411, 1420 (2009) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)). This Court's review of the OCCA's determination is therefore "doubly deferential." Id.

### b. Medical Records of VW's Mother

In support of the continuing threat aggravating circumstance, the State presented the testimony of Vonricca Warner during second stage. Ms. Warner was the mother of two of Petitioner's children, including VW. During her testimony, Ms. Warner recounted two instances of Petitioner's physical abuse. (Tr., Vol. VII, pp. 1307, 1310-11, 1316-17.) Ms. Warner testified that in one instance when she was three months pregnant, Petitioner picked her up and "body slammed" her to the ground. (Id. at 1317.) Afterwards, Ms. Warner had pains in her stomach. VW was born three months premature and has had medical problems throughout her life. (Id. at 1318-19.) Trial counsel for Petitioner objected to this testimony and argued that without medical evidence supporting the prosecution's theory that Petitioner's physical abuse caused VW's premature birth, such an inference should not be drawn. (Id. at 1313-16.) The trial court overruled the objection and Petitioner's trial counsel declined to cross-examine Ms. Warner. (Id. at 1323-24.) In his second stage closing argument, the prosecutor referenced Ms. Warner's testimony and argued that Petitioner's acts caused VW's medical problems. (Tr., Vol. VIII, p. 1504.) Petitioner's trial counsel objected and the trial court instructed the jury to disregard the prosecutor's statement. In clarification, the prosecutor told the jury that there was no medical evidence that Petitioner's abuse was the cause of VW's premature birth, but that "[Ms. Warner] didn't have any problems before that incident, she had some pains in her stomach after that, and then [VW] was born three months premature." (Id. at 1505-06.)

On direct appeal, Petitioner filed a motion to supplement the record on appeal pursuant to Rule 3.11(B)(3)(6) of the Rules of the Oklahoma Court of Criminal Appeals. Warner, 2006 OK CR 40, ¶¶ 207-15, 144 P.3d at 893-95. The OCCA's opinion on direct appeal appropriately summarizes the proffered material:

> [Petitioner] offers Exhibit 3 [Attachment 20 to Petition], a copy of a "Declaration of Custodian of Medical Records" from Lompoc District Hospital, Lompoc, California, regarding Vonricca Warner, with attached medical records. These medical records include a Discharge Summary, Obstetric Admitting Record, History and Physical Examination, Health History Summary, Initial Pregnancy Profile, Labor and Delivery Summary, Surgery Record, and Operative Report. These records essentially state that Vonricca Warner gave birth on January 29, 1992, by cesarean section to a female baby whose gestational age was 26 weeks. The records indicate the birth was very premature and the baby weight only 1 pound 9 ounces. The records also indicate that Vonricca Warner had past surgeries for laparotomy and laser surgery for endometriosis. Exhibit 4 [Attachment 21 to Petition] contains medical records from Lompoc District Hospital for [VW], whose birth is referred to above. These records include a Transfer Summary, Initial Newborn Profile, Newborn Discharge, Obstetric Admitting Record, and Labor and Delivery Summary. In addition to repeating much of the information included in the above records, these records indicate [VW's] birth at 26 weeks was extremely premature, she was in "poor condition" upon birth, and required an oxygen mask.
>
> Exhibit 5 [Attachment 19 to Petition] is a sworn affidavit from Sandra Collett, an investigator with OIDS. Ms. Collett states that at the request of appellate defense counsel, she obtained, via court order, medical records relating to Vonricca Warner's premature labor and delivery of [VW]. Ms. Collett also states that in her review of the medical records, she did not find any notations indicating the cause of the premature labor, and specifically that the records contained no allegations of domestic abuse of Vonricca Warner by [Petitioner]. However, the medical records did indicate that Vonricca Warner has a past surgical history significant for a laparotomy and laser surgery for endometriosis. Ms. Collett attaches a copy of relevant excerpts from The Merck Manual of Diagnosis and Therapy (17th ed. 1999) addressing endometriosis and premature labor.

Warner, 2006 OK CR 40, ¶¶ 213-14, 144 P.3d at 894-95.

The OCCA denied Petitioner's Rule 3.11 motion to supplement the record, concluding that trial counsel's "failure to use the attached medical records at trial is not sufficient to show by clear and convincing evidence a strong possibility of ineffectiveness." Id. ¶ 217, 144 P.3d at 895. Under Tenth Circuit precedent, the OCCA's determination is not entitled to AEDPA deference because it did not apply "the Strickland standard to the evidence, without regard to the additional 'clear and convincing evidence' hurdle of Rule 3.11(B)(3)(b)." Wilson v. Workman, 577 F.3d 1284, 1292 (10th Cir. 2009). Oklahoma's "clear and convincing" evidentiary standard in Rule 3.11 places a higher evidentiary burden than the Strickland "preponderance of the evidence" standard. Id. at 1297. As a result, this Court reviews Petitioner's ineffective of assistance of counsel claim de novo. Id. at 1292; see also Fairchild v. Workman, 579 F.3d at 1144 n.3 ("[A] denial of a Rule 3.11 motion does not necessarily constitute a determination on the merits of the defendant's ineffectiveness claim."); Lott v. Workman, ___ F.3d ___, 2011 WL 1302286, *43 (W.D. Okla. Mar. 31, 2011) (reviewing OCCA's denial of habeas petitioner's ineffective assistance of counsel claim de novo because state court relied upon "clear and convincing" evidentiary standard).

When taken in context, the failure of trial counsel to acquire and subsequently use Ms. Warner's medical records was not "so serious as to deprive the defendant of a fair trial." Strickland, 466 U.S. at 687. Petitioner argues the medical records would have permitted trial counsel to challenge the prosecution's assertion that the premature birth of VW may have resulted from Ms. Warner's past medical history. (Pet. at 134.) He also asserts that the

medical records do not indicate that the premature birth was caused by domestic abuse. In an effort to demonstrate actual prejudice, Petitioner relies upon post-verdict juror interviews in which several jurors believed that Petitioner was responsible for the birth defects of his child and that this weighed heavily in the punishment decision (VI O.R. at 1158).

As previously mentioned, the prosecution was prohibited from arguing that VW's premature birth was a direct result of Petitioner's actions. In fact, the trial court admonished the jury to disregard the prosecutor's argument that Petitioner caused VW's medical problems. The prosecutor also clarified that there was no medical evidence to indicate Petitioner's actions caused the premature birth and subsequent medical problems. (Tr., Vol. VIII, pp. 1504-06.) As a result, the jury was not told that Petitioner was responsible for the premature birth.

In addition, the medical records do not give a reason for VW's premature birth. They do not indicate that Ms. Warner's medical history caused or contributed to her troubled pregnancy. At best, Petitioner's trial counsel would have been able to interpose an alternative reason for VW's premature birth, which the jury, in its discretion, could have disregarded. More importantly, in light of the evidence presented in aggravation, Petitioner has not established that failure to use the attached medical records "undermine[s] confidence in the outcome" of the jury's sentencing determination. Strickland, 466 U.S. at 694. The prosecution alleged and proved two aggravating circumstances beyond a reasonable doubt. In support of the heinous, atrocious, or cruel aggravator, the State presented evidence that Petitioner attempted to vaginally rape Victim before anally raping her and subsequently

causing her death through the infliction of skull fractures, broken ribs, and lacerated internal organs. Petitioner's history of domestic abuse, including his assaults on Vonricca Warner as well as his abuse of his daughter VW, supported the continuing threat aggravating factor. The submitted records would not have contradicted that Petitioner abused Ms. Warner – evidence by itself that supports the continuing threat aggravator. To be sure, Petitioner's sentencing stage included the damaging inference that he caused VW's premature birth and subsequent medical problems. However, the inclusion of the medical records would not have refuted that inference. When reviewed in context of the entire second stage evidence, the Court concludes Petitioner has failed to demonstrate he suffered prejudice sufficient to require habeas relief. See Richter, 562 U.S. at ___, 131 S.Ct. at 792 (a claim of ineffective assistance of counsel requires that "[t]he likelihood of a different result must be substantial, not just conceivable.").

### c. Double Jeopardy

Petitioner argues his appellate counsel was ineffective for failing to argue that his third trial was barred by the Double Jeopardy Clause of the Fifth Amendment. (Pet. at 135-42.) Petitioner's original trial in March of 1999 was reversed on direct appeal. Warner, 2001 OK CR 11, 29 P.3d 569. In March of 2003, his trial on remand resulted in a mistrial. Subsequently, during his third trial in June of 2003, Petitioner was convicted and sentenced to death. Petitioner submits that his third trial was barred under double jeopardy principles and his appellate counsel's failure raise a double jeopardy claim resulted in ineffective assistance of counsel. Petitioner raised his claim in his Application for Post-Conviction

Relief and the OCCA denied the claim on the merits. Warner v. State, No. PCD-2003-897, slip op. at 3-8 (Dec. 19, 2006) (unpublished). As a result, this Court applies AEDPA deference to the OCCA's determination. 28 U.S.C. § 2254(d). Respondent argues the OCCA's determination is not contrary to, nor an unreasonable application of, clearly established federal law. (Resp. at 123-26).

Claims of ineffective assistance of appellate counsel are reviewed under the Strickland standard. Cargle, 317 F.3d at 1202. To succeed, Petitioner must show both "(1) constitutionally deficient performance, by demonstrating that his appellate counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding – in this case the appeal – would have been different." Id.; see also Smith v. Robbins, 528 U.S. 259, 285 (2000). Because both Strickland prongs must be met, a claim of ineffective assistance of counsel may be resolved solely on the ground of lack of prejudice. Strickland, 466 U.S. at 697. Therefore, Petitioner's claim for relief depends on the viability of his double jeopardy argument.

The Double Jeopardy Clause of the Fifth Amendment protects an individual from repeated prosecutions for the same offense. Oregon v. Kennedy, 456 U.S. 667, 671 (1982). See also Benton v. Maryland, 395 U.S. 784, 794 (1969) (Double Jeopardy Clause of the Fifth Amendment applies to the States through the Fourteenth Amendment). "[R]etrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused." Arizona v. Washington, 434 U.S. 497, 505

(1978). Ordinarily, a prosecutor must establish "'manifest necessity' for any mistrial declared over the objection of the defendant" in order to retry a defendant without violating double jeopardy. Id. "A defendant's motion for a mistrial constitutes 'a deliberate election on his part to forgo his valued right to have his guilt or innocence determined before the first trier of fact.'" Kennedy, 456 U.S. at 676 (quoting United States v. Scott, 437 U.S. 82, 93 (1978)). However, when a defendant moves for a mistrial as a result of government misconduct designed to provoke the defendant's motion, subsequent prosecution is prohibited by the Double Jeopardy Clause. Kennedy, 456 U.S. at 679. See also Walck v. Edmondson, 472 F.3d 1227, 1236, n.4 (10th Cir. 2007) ("Where a defendant requests or consents to a mistrial, there is no bar to retrial unless the government acted in a manner intended to induce a request for mistrial.").

Resolution of this claim requires the Court to recount the circumstances in which the state trial court granted Petitioner's motion for a mistrial in his March 2003 trial. During the prosecutor's opening statement, Petitioner's trial counsel objected and moved for a mistrial on the grounds of a possible discovery violation. (Tr., March 2003 Trial, Vol. III, pp. 483-84.) Defense counsel and the prosecutor argued over evidence from the medical examiner that the fact that no sperm was found on or in the body of the victim may be explained by the Victim's bowel movement. The trial court did not indicate that the prosecutor's comments were improper, but upon discussion that the diaper could be tested, the court recessed into chambers to discuss the matter with both parties. (Id. at 484-87.) After the in camera discussion, the following exchange took place:

THE COURT:  We're in chambers outside the hearing of the jury. Defendant's present, Counsel's present.  Go ahead, Ms. Spradlin.

MS. SPRADLIN[18]:  Your honor, we're moving for a mistrial based upon what just happened and what was overhead by the jurors in this matter. In response to our objection we –

THE COURT:  Who heard what?

MS. SPRADLIN:  The door was still partially open when we came in and the jury –

THE COURT:  For the record, what I did was I got the four lawyers back here and I said knock it off, stop it, you're arguing the evidence, you're throwing loops out here for things that don't exist.  Now stop it.  I'm telling both of you stop it.  We're going to go out here and try this case straight up, clean, with evidence.

MS. SPRADLIN:  The quote is I want this goddamned case tried –

THE COURT:  Tried correctly.

MS. SPRADLIN:  The quote that I was – I am stating was what was overheard by the jurors.  They were present in the courtroom and, Your Honor, you were yelling very loudly.

THE COURT:  Back here.

MS. SPRADLIN:  In chambers.  The door was partially open when you began yelling and we have spectators in the courtroom that we'd like to bring in to put on the record exactly what they observed in front of the jury and after the door closed.

THE COURT:  Motion for mistrial is granted.  Next thing.  Now what.

MR. KEEL[19]:  You're kidding me.

---

[18] Tamra Spradlin was one of Petitioner's attorneys at trial.

[19] Lou Keel was the Assistant District Attorney prosecuting Petitioner at trial.

THE COURT: No. If I said something in front of the jury, if the jury – the jury's going out and if I've tainted the jury, it's sustained. Now, if you have something you wanted to get tested, get it tested.

(Id. at 487-89).

As the record reflects, the mistrial was granted at Petitioner's request. Petitioner argues the trial court irrationally decided to abruptly end the trial based upon the trial court's own inappropriate conduct. Further, according to Petitioner, there is no evidence that anyone apart from the parties heard the trial court's comments during the in camera discussion. (Pet. at 139-40.) Upon retrial, Petitioner's trial counsel argued double jeopardy prevented retrial. The trial court denied the motion, ruling:

The statement that Mr. Keel made during opening statements was more properly made as closing as it's a reasonable inference from the evidence as opposed to what the evidence will actually show. I don't think that raises double jeopardy in this case. That's overruled.

(Tr., Vol. I, p. 8).

In denying Petitioner relief on post-conviction review, the OCCA concluded that the trial court's decision to grant the mistrial was based upon the possibility that the jury may have been tainted by his comments during the in camera hearing. Warner, No. PCD-2003-897, slip op. at 6. As a result, the ruling was not made in bad faith, but rather out of an abundance of caution to ensure Petitioner's fair trial. Further, the trial court's decision was within its discretion. In addition, even though the trial court appeared to ignore the actual basis for the mistrial in its denial of Petitioner's motion in the June 2003 trial, Petitioner

failed to demonstrate that had appellate counsel appealed the double jeopardy issue, Petitioner would have been afforded relief.  Id. at 7.

Petitioner has failed to establish that the OCCA's determination was contrary to, or an unreasonable application of, clearly established federal law.  The OCCA's conclusion that neither the prosecutor nor the trial court acted in bad faith is not an unreasonable factual determination in light of the evidence presented.

### d.    Conclusion

Petitioner's fifteenth ground for relief, in which he argues he received ineffective assistance of counsel, is denied.

### 16.    Ground Sixteen:  Cumulative Error

In his sixteenth claim for relief, Petitioner argues the accumulated effect of errors alleged in Grounds One through Fifteen rendered both his guilt and penalty phase proceedings fundamentally unfair in violation of the Fourteenth Amendment.[20]  Petitioner raised a cumulative error claim on direct appeal and the OCCA denied relief.  Warner, 2006 OK CR 40, ¶ 223, 144 P.3d at 896.

---

[20] Respondent argues there is no clearly established federal law as determined by the Supreme Court of the United States that controls Petitioner's cumulative error claim.  (Resp. at 126-28.)  Respondent is correct that the Supreme Court has yet to recognize a claim for reversible error based upon the aggregated effect of multiple harmless errors.  However, multiple circuit courts of appeals, including the Tenth Circuit, address claims of cumulative error on habeas review.  See, e.g., Workman, 342 F.3d at 1116-17; Hein v. Sullivan, 601 F.3d 897, 917-18 (9th Cir. 2010); Alvarez v. Boyd, 225 F.3d 820, 824-26 (7th Cir. 2000); Yohey v. Collins, 985 F.2d 222, 229 (5th Cir. 1993); but see Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir. 2002) (holding state court denial of cumulative error claim does not warrant relief under AEDPA because "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.").

Cumulative error may be present only "when the 'cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" <u>Workman</u>, 342 F.3d at 1116 (<u>quoting</u> <u>Duckett v. Mullin</u>, 306 F.3d 982, 992 (10th Cir. 2002), <u>quoting</u> <u>United States v. Rivera</u>, 900 F2d 1462, 1469 (10th Cir. 1990)). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." <u>United States v. Rivera</u>, 900 F.2d 1462, 1470 (10th Cir. 1990). In capital cases, the focused inquiry is "whether the errors 'so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case.'" <u>Wilson</u>, 536 F.3d at 1122 (<u>quoting</u> <u>Thornburg</u>, 422 F.3d at 1137).

The OCCA determined that "[w]hile certain errors did occur in this case, even considered together, they were not so egregious or numerous as to have denied [Petitioner] a fair trial." <u>Warner</u>, 2006 OK CR 40, ¶ 223, 144 P.3d at 896. <u>See also</u> <u>id.</u>, 2006 OK CR 40, ¶ 1, 144 at 897 (Lewis, J., concurring) ("I am of the opinion that there were several errors in the handling of this trial. However, in view of the overwhelming evidence of guilt, I concur in the result."). The OCCA's opinion clearly identified three errors (untimely <u>Gerstein</u> hearing in Ground 8; absence of "physical" in second stage jury instructions in Ground 13; and untimely aggravating factor sufficiency of the evidence determination from Ground 14). <u>Warner</u>, 2006 OK CR 40, ¶¶ 44-45, 135, 153-55, 144 P.3d at 864, 881, 884-85.

Having found no additional constitutional errors not identified by the OCCA, the Court reviews the OCCA's determination under the deferential AEDPA standard.  Brown, 515 F.3d at 1097.  Given the strength of the State's case in both first and second stage, as compared to Petitioner's case in mitigation, the OCCA's cumulative error analysis was a reasonable application of clearly established federal law.  Wilson, 536 F.3d at 1123. Accordingly, Petitioner's sixteenth claim for relief is denied.

## IV.    PETITIONER'S REQUEST FOR AN EVIDENTIARY HEARING

In the seventeenth ground for relief in his Petition and in a separate *Motion for Evidentiary Hearing* (Dkt. No. 30), Petitioner requests an evidentiary hearing to develop his claim of ineffective assistance of counsel relating to the use of Vonricca Warner's medical records.  (Pet. at 143-45.)  As previously discussed, the OCCA denied Petitioner's request for an evidentiary hearing on this issue on direct appeal.  Warner, 2006 OK CR ¶¶ 217-19, 225, 144 P.3d at 895, 896.

Requests for evidentiary hearings are governed by 28 U.S.C. § 2254(e)(2):

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–
>
> (A) the claim relies on–
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

A petitioner's diligence "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." Williams, 529 U.S. 420, 435 (2000). Pre-AEDPA standards of review apply when "a habeas petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so." Miller v. Champion, 161 F.3d 1249, 1253 (10th Cir. 1998). Under pre-AEDPA standards, Petitioner "is entitled to receive an evidentiary hearing so long as his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." Id.

Having considered the evidence Petitioner seeks to admit in an evidentiary hearing, the Court concludes, as it did in Ground 15 of the Petition, that Petitioner has not established an entitlement to relief. Petitioner was not prejudiced by his trial counsel's failure to use the medical records of Vonricca Warner. Accordingly, the Court denies Petitioner's request for an evidentiary hearing.

## V.    CONCLUSION

After a complete review of the transcripts, trial record, appellate record, record on post-conviction, briefs filed by Petitioner and Respondent, and the applicable law, the Court finds that Petitioner is not entitled to relief.

ACCORDINGLY, Petitioner's *Petition For a Writ of Habeas* (Dkt. No. 24) and *Motion for an Evidentiary Hearing* (Dkt. No. 30) are DENIED.  A judgment will enter accordingly.

IT IS SO ORDERED this 31st day of August, 2011.


ROBIN J. CAUTHRON
United States District Judge